## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| CHERYL RUDOLPH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.** |
| | ) | **2:05cv664-T** |
| KELLY AEROSPACE POWER SYSTEMS, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

### KELLY AEROSPACE POWER SYSTEMS, INC.'S MEMORANDUM OF FACT AND LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Kelly Aerospace Power Systems, Inc. ("Kelly") submits this memorandum in support of its motion for summary judgment.

## I.    INTRODUCTION

This action arises from the events surrounding the termination of Plaintiff Cheryl Rudolph's employment with Kelly on February 6, 2004. Rudolph alleges in her Complaint that Kelly terminated her employment based on her race in violation of Title VII, 42 U.S.C. § 2000e, et seq. ("Title VII") and in violation of Title 1981, 42 U.S.C. § 1981 ("§ 1981").[1] As discussed herein, these claims are due to be dismissed under Fed. R. Civ. P. 56 because: (1) Rudolph cannot demonstrate a prima facie case of discrimination or retaliation; (2) Kelly can articulate a legitimate, nondiscriminatory reason for terminating Rudolph's employment; and (3) there is no evidence that Kelly's stated reason for terminating Rudolph's employment is pretextual.

---

[1] "Because Title VII and § 1981 'have the same requirements of proof and use the same analytical framework,'" this brief will "'explicitly address the Title VII claim[s] with the understanding that the analysis applies to the § 1981 claim[s] as well.'" *Pate v. West Publ'g Corp.*, No. 2:04CV1131-T(WO), 2006 WL 13156, at *3 (M.D. Ala. Jan. 3, 2006) (quoting *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "material" if it is a legal element of a claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *see also Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen*, 121 F.3d at 646. On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. Although all reasonable inferences arising from the undisputed facts should be made in favor of the nonmoving party, an inference based on speculation and conjecture is not reasonable. *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985).

## III.    STATEMENT OF FACTS

### A.    Rudolph's Employment with Kelly

Kelly is in the business of manufacturing and distributing a varied line of component parts for piston and turbine aircraft. (Exhibit A, Declaration of David Nordgren at ¶ 2.) Kelly maintains a manufacturing and distribution facility in Fort Deposit, Alabama. (*Id.*)

Rudolph applied for a position with Kelly in July 2003. (Exhibit B, Deposition of Cheryl Rudolph at 25:18-25:23; *see also* Exhibit C, Declaration of Jenny Neese at ¶ 2.)   In November 2003, Kelly interviewed Rudolph for a position as a shipping clerk. (*Id.* at 32:3-32:11.) Rudolph interviewed with David Nordgren, Director of Supply Chain Management for Kelly. (*Id.* at

32:10-33:4; Nordgren Decl. at ¶ 1.)  During the interview, Rudolph never discussed with Nordgren the rate of pay for the position for which she was interviewing.  (*Id.* at 35:12-35:16.) In addition, Rudolph did not make any type of salary request or wage demand during her interview with Nordgren.  (*Id.* 35:17-35:21.)  Following the interview, Rudolph was offered a position with Kelly in the shipping department and began her employment on November 11, 2003.  (*Id.* at 37:5-37:8.)   Kelly's typical starting wage for entry-level positions, such as the position Rudolph accepted in the shipping department, is $6.50 per hour.  (Neese Decl. at ¶ 3.) Because Rudolph had some relevant experience working in a clothing warehouse and had some familiarity with handling goods for shipping, her starting wage was set at $7.00 per hour, instead of the typical $6.50 per hour.  (*Id.*)  Rudolph did not make any inquiry as to her pay rate until after she began her employment.  (Rudolph Depo. at 82:12-84:1.)  Rudolph testified that she was not unhappy with her pay rate of $7.00 per hour:

> Q.    Were you unhappy being paid seven dollars an hour at that time?
>
> A.    Well, no, because I thought it probably would be okay. You know, I thought it was okay at first.  I thought that maybe what the job was – you know, was paying me for what I was worth or whatever.

(*Id.* at 84:5-84:11.)

In the shipping department, Rudolph's duties and responsibilities included:  receiving order paperwork detailing the parts to be shipped, pulling the parts required for the order for shipment to customers, weighing the order, preparing the order for pickup, and loading the prepared order onto a pallet for shipment.  (*See id.* at 76:23-81:20.)  Rudolph worked as a shipping clerk for approximately one month and was then transferred to the stockroom on December 15, 2003.  (*Id.* at 85:5-85:9; Nordgren Decl. at ¶ 5 and Ex. 1 thereto.)  Rudolph was transferred to the stockroom because Kelly determined that more experienced workers were

needed in the shipping department, as shipping was a critical need for Kelly at that time and the job of a shipping clerk is somewhat more involved than the job of the stockroom clerk. (Nordgren Decl. at ¶ 5.)    Rudolph's duties in the stockroom were similar to her duties and responsibilities in the shipping department and included:  receiving paperwork indicating which parts to pull, pulling the indicated component parts, which Kelly would use to make other parts, and placing the parts on a cart for delivery to other areas of the warehouse.  (*Id.* at 87:20-89:22.) Rudolph's transfer to the stockroom did not require any specific "training" as the real "training" derives from an employee's familiarity with the job.  (Exhibit D, Declaration of Steve Miller at ¶ 2; Nordgren at ¶ 7.)  Rudolph's stockroom position merely required her to become familiar with the terminology and the location of the parts; no specialized training was necessary.  (*Id.*)  An employee willing to put forth the effort to learn this information becomes accustomed to the job duties over time.  (*Id.*)

Sometime after being transferred to the stockroom, Rudolph claims that she learned Renee Branum, a white female with whom she worked, was being paid at a higher rate than Rudolph.   (Rudolph Depo. at 108:7-109:11.)    Rudolph claims she complained about the difference in pay rate to David Nordgren who told Rudolph she needed to talk to someone in the personnel department.    (*Id.* at 109:14-110:7.)    Rudolph never spoke with anyone in the personnel department about her pay rate.  (*Id.* at 110:5-110:7.)

Rudolph also contends that she did not receive any training or assistance after her transfer to the stockroom.  (*See* Rudolph Depo. at 113:16-113:23.)  Rudolph claims she needed training on how to use the computer, which employees in the stockroom use to locate where the parts are kept.  (Rudolph Depo. at 116:4-117:7.)  However, as noted, no real training was required, as the

position merely required putting forth the effort to become familiar with the stockroom and the duties and responsibilities of the position. (Miller Decl. at ¶ 2.)

### B.    **Rudolph's Termination Due to Her Poor Performance**

Following Rudolph's transfer to the stockroom, her supervisor, Steve Miller, began to notice her poor performance. (Miller Decl. at ¶ 3.) Rudolph's poor performance included: mishandling and damaging parts, making mistakes in stocking, working at a slow pace, demonstrating a lack of concern for her mistakes, and exhibiting a poor attitude toward her supervisor. (*Id.*) Miller spoke with David Nordgren, Director of Supply Chain Management, also one of Rudolph's supervisors and to whom Miller reported, about Rudolph's poor performance. (*Id.* at 4; Nordgren Decl. at ¶ 8.) Nordgren spoke with Rudolph about her poor performance and made notes of his conversations with her. (Nordgren Decl. at ¶ 8 and Ex. 2 thereto.) On January 22, Nordgren spoke with Rudolph about needing to improve her attitude, speed, and accuracy. (*Id.*) The following day, Nordgren spoke with Rudolph about the need to ask questions. (*Id.*) On January 27, John Mincey, Kelly's Production Manager for Wastegates, Valves and Controls spoke to Rudolph about the parts she was pulling for his department, her failure to pull all of the proper parts, and the fact that she was damaging the parts she did pull. (*Id.*) On January 28, 29 & 30, Nordgren again spoke to Rudolph, this time about the fact that she sent a damaged part to the line and did not send all of the parts called for by the applicable work order. (*Id.*) Nordgren also spoke with Steve Miller about Rudolph's continued bad attitude and her failure to follow orders. (*Id.*) Also on January 30, Nordgren talked to Rudolph about her poor performance demonstrated by her inaccuracy and the fact that she was damaging parts and working too slowly. (*Id.*) Nordgren also spoke with Rudolph about her bad attitude toward her supervisor, Steve Miller. (*Id.*) On the same day, he spoke with Rudolph about her failure to follow certain Stockroom Flow Instructions. (*Id.* at ¶ 9 and Ex. 3 thereto.)

Finally, on February 4, 2004, Jeffrey R. Kelly, President of Kelly, learned of Rudolph's poor job performance. (Exhibit E, Declaration of Jeffrey R. Kelly ¶ 2.) Because Rudolph was approaching the end of her ninety day probationary period and her job performance level was well below that required, Mr. Kelly concluded it was appropriate to terminated Rudolph's employment. (*Id.*) On February 6, 2004, Nordgren and Jenny Neese, Human Resources Manager for Kelly, had a meeting with Rudolph in which they explained that her employment was being terminated because of her poor performance. (Nordgren Decl. at ¶ 10; Neese Decl. at ¶ 6 and Ex. 5 thereto.) Although Rudolph disagreed that she was poorly performing, she acknowledged that Nordgren and Neese informed her that her employment was in fact terminated because of her poor performance:

> Q.  How did you learn that your employment was ending?
>
>      . . .
>
> A.  David came to me and then he said that they would like to talk to – Jenny Neese would like to talk to me in the office. And that's when we proceeded to the office, and Jenny started telling me that we was going to have to terminate you – terminate you due to lack of work performance or something like that.

(Rudolph Depo. at 103:2-103:14.)

## C.  **Rudolph's Alleged Comparator**

On November 12, 2003, one day after Kelly hired Rudolph to work in its shipping department, Kelly hired Renee Branum also to work in the shipping department. (Neese Decl. at ¶ 4.) At the time of her application, Branum was manager of a Subway restaurant. (*Id.* at ¶ 5 and Ex. 3.) As manager of the Subway store, Branum was responsible for the entire store operation, including managing its employees and purchasing and controlling inventory levels. (*Id.*) Branum was interested in a position that would offer her both health insurance benefits and

greater opportunity than she had at Subway. (*Id.*) Branum was interviewed for an opening in the shipping department and she was willing to work in the shipping department; however, she explained that she would not accept the position unless she would earn approximately the same amount of money she had been earning with Subway, $350 per week. (*Id.*) Kelly has difficulty finding qualified individuals for positions in the shipping department and this department is critical to Kelly's business. (*Id.*) In order to make the position attractive to Branum and because of her relevant experience, Kelly offered Branum $8.00 per hour ($320 per week) plus benefits. (*Id.* and Ex. 4 thereto.) Branum accepted the position. (*Id.*)

Branum worked in the shipping department with Rudolph and was later transferred, along with Rudolph, to the stockroom. (Nordgren Decl. at ¶ 5; Miller Decl. at ¶ 2.) Both Branum and Rudolph made mistakes after moving to the stockroom; however, unlike Rudolph, Branum exhibited a willingness to learn and had a cooperative attitude. (Miller Decl. at ¶ 3.) Despite this willingness to learn, Branum later failed to follow the Stockroom Flow Instructions and was eventually terminated on March 30, 2005 because of her violation of company policy. (Neese Decl. at ¶ 7 and Ex. 6.)

## IV.    ARGUMENT

### A.    Rudolph's Discriminatory Discharge Claim is Due to Be Dismissed

Rudolph alleges that Kelly terminated her employment based on her race in violation of Title VII and § 1981. Because Rudolph relies on circumstantial evidence, this invokes the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), for her Title VII and § 1981 race discrimination claims. *See, e.g., Standard*, 161 F.3d at 1330-31. Under the *McDonnell Douglas/Burdine* framework, the claimant must first show an inference of discriminatory intent, and thus carries the initial burden of establishing a prima facie case of

discrimination. *McDonnell Douglas*, 411 U.S. at 802; *see Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to meet its burden, the plaintiff must then show that the proffered reason is merely a pretext for discrimination. *Burdine*, 450 U.S. at 253.

In the present case, Rudolph's discrimination claims are due to be dismissed because Rudolph cannot establish a prima facie case. Even if Rudolph could establish a prima facie case, Kelly is still entitled to summary judgment in its favor. Kelly had a legitimate, nondiscriminatory reason for terminating Rudolph's employment. There is no evidence that Kelly's stated reason for terminating Rudolph's employment is pretextual.

### 1.    Rudolph Cannot Establish a Prima Facie Case

To succeed with a discriminatory discharge claim, a plaintiff must show that: (1) she is a member of a protected minority; (2) she was qualified for the job from which she was discharged; (3) she was discharged; and (4) she was treated less favorably than a similarly situated individual outside her protected class or her former position was filled by a non-minority. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). In the present case, Rudolph has not alleged that Kelly filled her former position with a white individual; instead, she alleges that she was treated differently than a similarly situated individual outside her class.

Rudolph cannot show that Kelly treated her less favorably than a similarly situated individual outside her protected class. Nor can Rudolph demonstrate that a similarly situated individual was treated differently. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are

involved in or accused of the same or similar conduct and are disciplined in different ways."
*Holifield*, 115 F. 3d at 1562. "The most important factors in the disciplinary context . . . are the
nature of the offenses committed and the nature of the punishment imposed." *Silvera v. Orange
Co. School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quotation omitted)). "[I]n order to satisfy
the similar offenses prong, *the comparator's misconduct must be nearly identical* to the plaintiff's
in order to prevent courts from second-guessing employers' reasonable decisions and confusing
apples with oranges." *Id.* at 1259 (quotation omitted) (emphasis added). Summary judgment is
appropriate if the plaintiff fails to show the existence of a similarly situated employee, and no
other evidence of discrimination is present. *Holifield*, 115 F.3d at 1562.

Kelly terminated Rudolph's employment because of her poor work performance.
Rudolph has not and cannot identify a white individual who has engaged in a similar pattern of
poor work performance and has not been fired by Kelly. At the time of Rudolph's termination,
she had been counseled numerous times about her poor performance beginning in mid-January.
(*See* Nordgren Decl. at ¶ 8-9 and Ex. 2, 3 thereto.) Conversely, Renee Branum, whom Rudolph
contends is a proper comparator, though initially making mistakes, exhibited a willingness to
learn and a cooperative attitude. (*See* Miller Decl. at ¶ 3.) At the time leading up to Rudolph's
termination, Rudolph and Branum simply were not committing the same type of misconduct:
Rudolph continued to make mistakes without concern, exhibited a bad attitude, and made
numerous documented mistakes, unlike Branum who was willing to learn from her mistakes, did
not make repetitive damaging mistakes, and had a cooperative attitude. (*Id.*) Rudolph and
Branum were not similarly situated. *See Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir.
1999) ("the quantity and quality of the comparator's misconduct [must] be nearly identical to

prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges").

Rudolph admits that if she and Branum were treated in the same manner she would have no claim at all.

> Q.    Is it your allegation in this lawsuit that the company treated this white woman better than you because she's white and you're black and this is about race discrimination?
>
> A.    Yes.
>
> Q.    So that if the company had treated Renee Branum and you the same way, you wouldn't have a complaint here. Isn't that right?
>
> A.    I wouldn't.

(Rudolph Depo. at 127.22-128:8.) Not only were Rudolph and Branum not similarly situated at the time of Rudolph's termination, but Branum too was ultimately terminated. (Neese Decl. at ¶ 7 and Ex. 6 thereto.) Although she did not have a similar history of poor performance at the time Rudolph's employment was terminated, Branum's performance did subsequently fall below that required and her employment was terminated on March 30, 2005 for violating company policy. ((Nordgren Decl. at ¶ 11 and Ex. 4 thereto; Neese Decl. at ¶ 7 and Ex. 6 thereto.)    Rudolph simply cannot establish that she and Branum were similarly situated. Alternatively, Rudolph clearly cannot show that Branum was treated differently once her performance fell below that required. *See Phillips v. Hibbit Sporting Goods, Inc.*, 329 F. Supp. 2d 1280, 1293-94 (M.D. Ala. 2004) (holding plaintiff failed to establish prima facie case where she could not "point to another employee of a different race . . . who engaged in similar conduct, but was not fired").

Because Rudolph is unable to establish the existence of a similarly situated employee, her discriminatory discharge claim fails as a matter of law.

2.    Kelly Can Articulate a Legitimate, Nondiscriminatory Reason for
Rudolph's Termination

Rudolph's discrimination claim also fails as a matter of law because Kelly can articulate

a legitimate, nondiscriminatory reason for terminating Rudolph's employment. Rudolph's

termination had nothing to do with her race, and she can present no such evidence. Plaintiff's

personnel file reflects she was warned that she was not complying with several Stockroom Flow

Instructions and that her performance was substandard. (Nordgren at ¶ 9 and Ex. 3 thereto.) In

fact, these failures were brought to her attention on more than one occasion. (*Id.* at ¶ 8-9 and Ex.

2-3 thereto.) Kelly had a well-documented belief that Rudolph's performance was well below

that required.

Sometime after Rudolph was transferred to the stockroom, her supervisor, Miller,

informed Nordgren that she was not performing to the level required, that she was making

mistakes, demonstrating no concern for those mistakes, and exhibiting a poor attitude. (Miller

Decl. at ¶ 4; Nordgren Decl. at ¶ 8.) In January 2004, Nordgren spoke to Rudolph about her poor

performance: on January 22: about the need for her to improve her attitude, speed, and accuracy;

on January 23, about the need to ask questions when she was unsure about what needs to be

done; on January 28, 29 & 30: about the fact that she sent a damaged part to the line and did not

send all of the parts called for by the applicable work order; on January 30: about her poor

performance, specifically, her inaccuracy, the fact that she was damaging parts, that she was

working too slowly, and about her bad attitude toward her supervisor, Steve Miller. (*Id.* and Ex.

2 thereto.)    In addition, on January 27, John Mincey, Kelly's Production Manager for

Wastegates, Valves and Controls, spoke to Rudolph about the parts she was pulling for his

department; and informed her that she was failing to pull all of the proper parts and damaging

those parts that she did pull. (*Id.*)  On January 30, 2004, Nordgren reviewed with Rudolph the Stockroom Flow Instructions she continued to disobey. (*Id.* at ¶ 9 and Ex. 3 thereto.)

Rudolph acknowledges that John Mincey called a meeting, which she was required to attend in which the topic was "quality."  (Rudolph Depo. at 98:22-100:5, 101:19-102:10.) Rudolph also admits to attending "training sessions" in which the topic was "how . . . to try to get better in this area." (*Id.* at 125:11-126:4.)    Rudolph acknowledges that she was told her employment was being terminated because of her poor performance.  (*Id.* at 103:2-103:14.) Kelly believed Rudolph was not performing adequately, Kelly documented Rudolph's poor performance, and Rudolph's employment was ultimately terminated because of her continued poor performance.  The termination of Rudolph's employment had nothing to do with her race.

Accordingly, Kelly can articulate a legitimate, nondiscriminatory reason for terminating Rudolph's employment.  Kelly, therefore, is entitled to summary judgment on Rudolph's discriminatory discharge claim.

### 3.    There is No Evidence that Kelly's Legitimate, Nondiscriminatory Reason for Rudolph's Discharge is Pretext

To show the proffered reason is merely a pretext, an employee must:

> demonstrate that the proffered reason was not the true reason for the employment decision . . . [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Jackson v. State of Alabama State Tenure Comm.,* 405 F.3d 1276, 1289 (11th Cir. 2005) (quotation omitted).  The plaintiff must set forth "sufficient evidence to allow a reasonable finder of fact to conclude that the defendants' articulated reasons for its decision are not believable." *Id.* at 1289 (quotation omitted).  A plaintiff can accomplish this by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanation.

*Id.* (quotation omitted).    "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993). A plaintiff does not establish pretext "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).

In the present case, Rudolph cannot present any evidence that would allow a reasonable finder of fact to conclude Kelly's articulated reason for terminating her employment is not believable. Simply put, the stated reasons are true. Rudolph's personnel file reflects her poor performance and she admits being required to attend "training sessions" where the topic was "quality" and "better" performance. (*See* Rudolph Depo. at 125:11-126:21.)    Rudolph admits she was informed the termination of her employment was due to her poor performance. (Rudolph Depo. at 103:2-103:14.)    There are no "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Kelly's reason that would suggest the reason is unworthy of credence. Rudolph simply failed to perform to the level required.

When presented with similar facts in *Rojas v. Florida*, 285 F.3d 1339 (11th Cir. 2002), the Eleventh Circuit Court of Appeals held that the trial court properly granted the defendant-employer's motion for summary judgment. In *Rojas*, the defendant terminated the plaintiff's employment because of her "poor work performance, failure to follow department procedures, tardiness, and turning over her work as supervisor to subordinates." *Id.* at 1342. In analyzing the claim, the court noted that it "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees. The factual issue to be resolved is not the wisdom or accuracy of [the employer's] conclusion that [the plaintiff] was an unsatisfactory

employee." *Id.* Instead, the focus of the analysis concerns "whether unlawful discriminatory animus motivates a challenged employment decision'" not whether the decision was "prudent or fair." *Id.* (quotation omitted). The *Rojas* court held that the plaintiff failed to carry her burden of showing pretext where "no evidence exists to show that similarly situated . . . workers were treated differently:    workers of both sexes were subsequently fired for failure to follow procedures . . . . In such a situation, no basis for pretext exists." *Id.* at 1344; *see Warner-Stanton v. Blue Cross and Blue Shield of Ga., Inc.*, No. 4:04-cv-83, 2006 WL 42145, at \*9 (M.D. Ga. Jan. 6, 2006) (granting summary judgment in favor of defendant-employer finding no pretext and noting plaintiff's supervisor "imposed her standards across the board. Ironically, she also fired for poor performance [an] employee [outside the plaintiff's protected class] . . . who was likely the most comparable employee to plaintiff in the entire organization."). In the present case, Rudolph and Branum were not similarly situated. Rudolph was poorly performing and this substandard performance was well documented. (*See* Nordgren Decl. at ¶ 8-9 and Ex. 2-3 thereto.) In addition, Branum was ultimately terminated for violation of company policy. (Neese Decl. at ¶ 7 and Ex. 6 thereto.)

Rudolph cannot carry her burden of proving pretext simply by asserting her belief that she was a good employee. *See Jones v. United Space Alliance, L.L.C.,* No. 04-00078*, slip op.* at 11 (11th Cir. Feb. 3, 2006) (noting "an analysis of pretext focuses on the employer's beliefs, not the employee's own perceptions of his performance" and affirming summary judgment in favor of defendant-employer where plaintiff "did not produce any evidence to indicate [employer's] motivation for [plaintiff's] discharge was for any reason other than his poor performance.") (quotation omitted); *Wu v. Southeast-Atlantic Beverage Corp.*, 321 F. Supp. 2d 1317, 1338 (N.D. Ga. 2004) (holding "[n]one of [plaintiff's] evidence, *including plaintiff's own evaluation of his*

*performance*, is sufficient to support a finding of pretext") (emphasis added); *Holifield*, 115 F.3d at 1565 ("where the employer produces performance reviews and other documentary evidence . . . that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence"). Rudolph has not and cannot, therefore, present any evidence, much less "significantly probative evidence," that Kelly's stated reason for terminating her employment is pretextual.

Because Rudolph cannot demonstrate a prima facie case of race discrimination and because Kelly can articulate a legitimate, nondiscriminatory reason for terminating Rudolph's employment that is not pretextual, Rudolph's discriminatory discharge claim fails as a matter of law.

**B.    Rudolph's Retaliation Claim Fails As a Matter of Law.**

"To establish a prima facie case of retaliation, a plaintiff must show that: (1) [she] engaged in a statutorily protected expression; (2) [she] suffered an adverse employment action; and (3) there is a causal connection between the two events." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002) (quotation omitted). "If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to articulate legitimate reasons for the adverse employment action." *Id.* (quotation omitted). In the present case, Rudolph cannot establish a prima facie case of retaliation because (1) she did not engage in a statutorily protected expression; and (2) there is no causal connection between her actions and the termination of her employment. Moreover, Rudolph's retaliation claim fails as a matter of law because Kelly had a legitimate, nondiscriminatory reason for ending Rudolph's employment.

1.    Rudolph Cannot Establish a Prima Facie Case of Retaliation.

Title VII recognizes two forms of protected conduct. An employee is protected from discrimination if: 1) she has opposed any practice made an unlawful employment practice (the

opposition clause) or 2) she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing (the participation clause). *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999). Here, the allegations made in the charge of discrimination and the Complaint demonstrate that this case does not fall under the participation clause.

The opposition clause is likewise inapplicable here. An employee who seeks protection under the opposition clause must have a "good faith, reasonable belief" that her employer has engaged in unlawful discrimination. *Clover*, 176 F.3d at 1351. The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law. *Id.*

It is unclear from plaintiff's complaint exactly what activity she contends she engaged in and was retaliated against therefore. However, Rudolph will likely contend that the inquiry she made about her pay rate to David Nordgren was a complaint of discrimination. A "plaintiff must prove both that she subjectively believed discrimination . . . had occurred and that her 'belief, though perhaps mistaken, was objectively reasonable.'" *Hogan v. Bellsouth Corp.*, 396 F. Supp. 2d 1333, 1350 (N.D. Ga. 2004), *aff'd without opinion* 141 Fed. Appx. 909 (11th Cir. 2005), (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). Rudolph only once questioned why she was being paid less than Branum, and she was advised to direct her questions to the personnel department. (Rudolph Depo. at 109:19-110:1.) However, Rudolph never talked to anyone in personnel about her pay. (*Id.* at 110:2-110:7.) The simple fact that Renee Branum and Rudolph are of different races and were paid at different rates is not enough to support an objectively reasonable belief of discrimination. *See Butler v. Albany Int'l,*

273 F. Supp. 2d 1278, 1288 (M.D. 2003), *aff'd without opinion* 107 Fed. Appx. 184 (11th Cir. 2004).

Moreover, Rudolph has not articulated any basis from which this court can conclude she subjectively believed she was being discriminated against because she was not receiving the training she contends she desired and was not receiving the level of assistance in performing her job that she desired.  There is no evidence that such a belief would have been objectively reasonable.  No particular training was required for Rudolph's position in the stockroom.  (Miller Decl. at ¶ 2; Nordgren at ¶ 7.)  Rudolph simply needed to put forth the effort to become familiar with the part locations and the terminology of the position.  (*Id.*)  Steve Miller assisted both Rudolph and Branum.  (*Id.*)  Rudolph's contention that she did not receive as much or the amount of assistance she desired does not amount to an objectively reasonable belief that this alleged deficiency was due to discrimination or that her alleged complaints about the level of training and assistance were complaints of discrimination.

Rudolph could not have formed a "good faith, reasonable belief" that Kelly had engaged in an unlawful employment practice and, thus, cannot make out a prima facia case.  Accordingly, her retaliation claim fails as a matter of law.

### 2.    There is No Causal Link Between Rudolph's Complaints and the Alleged Retaliation

Rudolph cannot present evidence that the decision maker, President Jeffrey Kelly, knew, prior to the time of his decision to terminate Rudolph's employment, of her alleged claims of discrimination.  Therefore, she cannot establish the requisite causal connection between any protected conduct and the adverse employment action.  Her retaliation claim against Kelly fails as a matter of law.

In order to prevail on a retaliation claim, a plaintiff must establish the requisite causal connection between her statutorily protected conduct and the adverse employment action. *Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) (affirming summary judgment in favor of defendant-employer on retaliation claim under Family Medical Leave Act and applying same analysis as used in Title VII circumstantial evidence cases). To establish that causal connection, a plaintiff must show that the protected activity and the adverse action were not wholly unrelated. *Id.* at 799. In order to make this showing, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action. *Id.* This requirement "rests upon common sense[,]" recognizing that "[a] decision maker cannot have been motivated to retaliate by something unknown to him." *Id.*

Temporal proximity alone, however, is insufficient to create a genuine issue of fact as to causation where there is unrebutted evidence the decision maker did not have knowledge the employee had engaged in protected conduct. *Id.* Knowledge is not imputed to the corporation where other corporate officials or supervisors had knowledge of the protected action. *Id.* at 800. Instead, the actual decision maker must have had knowledge of the protected conduct. *Id.* For her retaliation claim to succeed, Rudolph must show that Jeffrey R. Kelly, who made the decision to terminate her employment, knew that she had engaged in protected activity.

David Nordgren to whom Rudolph contends she mentioned the pay differential and her desire for training, and Steve Miller, to whom Rudolph allegedly complained about her desire for training and assistance, were not the individuals who made the decision to terminate Rudolph's employment. Instead, that decision was made by the President of Kelly, Jeffrey R. Kelly. (Kelly Decl. at ¶ 2.) There is no evidence that President Kelly was aware of Rudolph's complaints or

purported claims of discrimination. Accordingly, there is no basis upon which this court can conclude the defendant engaged in statutorily protected activity and was terminated therefore. Rudolph cannot establish a prima facie case of retaliation and Kelly is entitled to summary judgment.

### 3. Kelly Had a Legitimate, Nondiscriminatory Reason for Terminating Rudolph's Employment.

If Rudolph can make out a prima facie case of retaliation, which she cannot, the burden shifts to Kelly to produce legitimate reasons for the adverse employment action. *Brochu*, 304 F.3d at 1155. Kelly's burden is "exceedingly light" and is one of production, not persuasion. *Phillips*, 329 F. Supp. 2d at 1288. Consequently, Kelly need only produce evidence that could allow a rational fact-finder to conclude that the challenged employment action was not made for a discriminatory or retaliatory reason. *Id.*

Poor job performance is a legitimate, nondiscriminatory reason for termination. *See, e.g., Ashe v. Aronov Homes, Inc.*, 354 F. Supp. 2d 1251, 1259 (M.D. of Ala. 2004) ("Plainly, job performance, failure to follow instructions, and insubordination are all legitimate, nondiscriminatory considerations."). As fully discussed above, Rudolph was terminated for her documented poor performance. Kelly had a legitimate, nondiscriminatory reason for terminating Rudolph's employment and Rudolph's retaliation claim, therefore, fails as a matter of law.

### 4. There is No Evidence that Kelly's Legitimate Nondiscriminatory Reason is Pretext

As fully explained above, Rudolph cannot set forth any, and certainly not sufficient, evidence to establish pretext. Rudolph's poor performance was well-documented and she can point to no similarly situated employee who was treated differently. The inquiry of pretext is "limited to whether the employer gave an honest explanation of its behavior." *Phillips*, 399 F.

Supp. 2d at 1294 (quotation omitted). Rudolph was terminated because of her poor performance and her retaliation claim fails as a matter of law.

## C.    Rudolph's Wage Discrimination Claim is Due to Be Dismissed[2]

The same *McDonnell Douglas* framework applies to a discriminatory wage claim as applies, and explained above, to a discriminatory discharge claim. *See Daniel v. Church's Chicken*, 942 F. Supp. 533, 538 (S.D. Ala. 1996). To establish a prima facie case, the plaintiff must show:

> (1) that she belongs to a racial[] minority, (2) that she asked for and was qualified for a raise, (3) that despite her qualifications she was denied a raise, and (4) at the time she was denied additional compensation the pay [of comparable employees] of a different race . . . was higher than what she received.

*Id.*

### 1.    Rudolph Cannot Establish a Prima Facie Case

Rudolph cannot prove that she asked for or was qualified for a higher pay rate. Rudolph readily admits that when she asked David Nordgren about the pay difference between her pay rate and Branum's pay rate, he instructed her to address the issue with the personnel department; Rudolph never contacted anyone in the personnel department about her pay rate.

> Q.    Basically he said you have to talk to the personnel department about it?
>
> A.    Yeah.
>
> Q.    Did you ever talk to anyone at the personnel department about it?
>
> A.    No.

(Rudolph Depo. at 110:2-110:7.) Rudolph clearly never asked for additional compensation.

---

[2] It is unclear from Rudolph's complaint whether she actually makes a separate claim for wage discrimination and Kelly does not concede such a claim is properly pled. However, to the extent such a claim is made, it fails as described herein.

Moreover, Rudolph was not qualified to receive a higher pay rate. The typical entry-level position, such as Rudolph's position in the shipping department and her position as a stockroom clerk, pays at the rate of $6.50 per hour. (Neese Decl. at ¶ 3.) Rudolph received $7.00 per hour to reflect her experience. (*Id.*) In addition, Rudolph's poor performance certainly did not justify or qualify her for any increase in pay. Rudolph cannot make out a prima facie case and her wage discrimination claim fails as a matter of law.

> 2. Kelly Can Articulate a Legitimate, Nondiscriminatory Reason for the Pay Differential

Rudolph never made any type of wage demand. (Rudolph Depo. at 35:17-35:20.) Further, Rudolph never even inquired about her pay rate until after she began her employment. (*Id.* at 35:12-36:1; 82:12-83:1.) Rudolph's position as a shipping clerk typically paid at the rate of $6.50 per hour. (Neese Decl. at ¶ 2.) However, because Rudolph had some relevant experience, her pay rate was set at $7.00 per hour, rather than the typical $6.50 per hour. Prior to beginning her employment with Kelly, Renee Branum was the manager of a Subway restaurant and was responsible for operation of the entire store, managing the employees, and purchasing and controlling inventory levels. (*Id.*) Following Branum's application, Kelly needed to fill a position in the shipping department. (*Id.* at ¶ 5.) Kelly has difficulty finding qualified applicants to fill its critical need in the shipping department. (*Id.*) Because of Branum's experience and because she specified that she would not change positions unless she could make approximately the same amount of money she was earning at Subway, $350 per week, Kelly offered her $8.00 per hour ($320 per week) plus benefits for a position as a shipping clerk in an attempt to make the position attractive to Branum. (*Id.*) The pay differential between Rudolph and Branum had nothing to do with race; instead, it was based on experience and negotiation. "It is a reality of today's economic environment that not all similarly situated employees are paid

the same.   In many businesses, there are one or more employees that are paid less than employees with the same title or classification." *Daniel*, 942 F. Supp. at 540 (holding "[w]hile [defendant] may not have paid [plaintiff] the same way as other managers, the court was not presented with sufficient evidence showing that her treatment was attributable to intentional . . . racial discrimination"). Kelly had a legitimate, nondiscriminatory reason for the pay differential. Accordingly, Kelly is entitled to summary judgment on Rudolph's wage discrimination claim.

### 3.    There is No Evidence that Kelly's Legitimate, Nondiscriminatory Reason is Pretext

An employer's business decisions, including its pay decisions should not be second-guessed by the Court. *Butler*, 273 F. Supp. 2d at 1287.  It is well-established that federal courts should not serve as super-personnel departments that reexamine an entity's business decisions. *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F. 2d 1466, 1470 (11th Cir. 1991)).  In deciding the issue of pretext, it must be borne in mind that "an employer may [take an employment action] for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F. 2d 1181, 1187 (11th Cir. 1984).

In *Butler*, the court granted summary judgment in favor of the defendant-employer on plaintiff's wage based discrimination claim where the plaintiff offered "*no* evidence to support her assertion of discrimination, instead she simply reaches that conclusion because of her inability to 'surmise' anything else." 273 F. Supp. 2d at 1288 (noting plaintiff's statement that she "surmise[d]" as the reason for the pay disparity that her comparator was male, and she female.). Such unsubstantiated assertions are insufficient to withstand a motion for summary judgment. *Id.* at 1288.

In the instant action, Rudolph also simply surmises discrimination. Rudolph was paid at a rate higher than the typical rate for an entry-level position such as hers and the simple fact that Branum, a white employee, was paid at a higher rate is not enough to establish discrimination. Rudolph admitted she was not unhappy with her pay. (*See* Rudolph Depo. at 84:5-84:11.) Her pay rate of $7.00 reflected her relevant experience. Rudolph readily admits that she made absolutely no inquiry as to salary at the time she interviewed for the position. (Rudolph Depo. at 35:12-36:1.) Further, she admits she made no wage demand during her interview. (*Id.*) In fact, when plaintiff accepted the job she did so without ever inquiring as to her rate of pay. (*Id.* at 82:12-83:1.) It was not until after Rudolph began work that she even asked about her pay rate. (*Id.*) After Rudolph learned she was paid less than Branum, Rudolph simply "surmised" that the pay differential was because she is black and Branum is white. This claim is simply insufficient and unsubstantiated. Instead, Branum's experience as a manager dictated a higher pay rate and Branum, unlike Rudolph, made a wage demand prior to accepting employment. (Neese Decl. at ¶ 5.) Branum was earning $350 per week managing a Subway restaurant and explained that she would not change jobs unless she could earn approximately the same amount. (*Id.*) Accordingly, because of this wage demand, her experience, and Kelly's difficulty in finding qualified individuals for the shipping department, Branum was offered $8.00 per hour ($320 per week) plus benefits in order to attract her to the position and reflect her relevant experience. (*Id.*) Race was not a factor in determining Rudolph's pay rate.

Rudolph is simply surmising that the pay decision was discriminatory. She has no evidence to support her position. Pursuant to *Butler*, her claim cannot survive summary judgment. 273 F. Supp. 2d at 1288; *see also, Hammock v. Nexcel Synthetics, Inc.*, 201 F. Supp. 2d 1180, 1187 (N.D. Ala. 2002) (dismissing on summary judgment plaintiff's claims of pay

discrimination under Title VII and holding that a plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer). Kelly has produced a legitimate, nondiscriminatory reason for the pay decision and there is no evidence of pretext. Rudolph's discriminatory wage claim, to the extent she has made one, fails as a matter of law.

## V.    CONCLUSION

For the foregoing reasons, Kelly's motion for summary judgment is due to be granted.

Respectfully submitted on this 14th day of February, 2006.


/s Kelly F. Pate

**OF COUNSEL**:
Charles B. Paterson (PAT018)
Kelly F. Pate (FIT014)
BALCH & BINGHAM LLP
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104-2549
Telephone: (334) 834-6500
Facsimile: (866) 736-3857
E-mail: cpaterson@balch.com


Alan Rauss
KORHMAN, JACKSON & KRANTZ
One Cleveland Center, 20th Floor
Cleveland, OH 44114
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
E-mail: amr@kjk.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of February, 2006, I have electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, to the following:

> Janice Spears-Turk, Esq.
> Law Offices of J.D. Spears-Turk
> 2735 Office Park Circle
> Montgomery, Alabama 36116
>
> Kathryn Dickey, Esq.
> Attorney at Law
> 322 Alabama Street
> Montgomery, Alabama 36104

/s Kelly F. Pate
OF COUNSEL
