## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **CHERYL RUDOLPH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.** |
| ) | **2:05cv664-T** |
| **KELLY AEROSPACE POWER SYSTEMS,** ) | |
| **INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## DEFENDANT KELLY AEROSPACE POWER SYSTEMS, INC.'S SUBMISSION STATEMENT IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Kelly Aerospace Power Systems, Inc. submits the following evidence in support of its motion for summary judgment:

1.   Exhibit A:  Declaration of David Nordgren and Exhibits 1 – 4 thereto;

2.   Exhibit B:  Cheryl Rudolph deposition excerpts;

3.   Exhibit C:  Declaration of Jenny Neese and Exhibits 1-6 thereto;

4.   Exhibit D:  Declaration of Steve Miller and Exhibit 1 thereto;

5.   Exhibit E:  Declaration of Jeffrey R. Kelly and Exhibit 1 thereto.

Respectfully submitted on this 14th day of February, 2006.


/s Kelly F. Pate


**OF COUNSEL**:
Charles B. Paterson (PAT018)
Kelly F. Pate (FIT014)
BALCH & BINGHAM LLP
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104-2549
Telephone: (334) 834-6500
Facsimile: (866) 736-3857
E-mail: cpaterson@balch.com

Alan Rauss
KORHMAN, JACKSON & KRANTZ
One Cleveland Center, 20th Floor
Cleveland, OH 44114
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
E-mail: amr@kjk.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of February, 2006, I have electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, to the following:

> Janice Spears-Turk, Esq.
> Law Offices of J.D. Spears-Turk
> 2735 Office Park Circle
> Montgomery, Alabama 36116
>
> Kathryn Dickey, Esq.
> Attorney at Law
> 322 Alabama Street
> Montgomery, Alabama 36104

/s Kelly F. Pate
OF COUNSEL

165382.1                                          2

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CHERYL RUDOLPH,                                )
                                               )
        Plaintiff,                             )
                                               )
v.                                             )          Case No.
                                               )          2:05cv664-T
KELLY AEROSPACE POWER SYSTEMS, )
INC.,                                          )
                                               )
        Defendant.                             )

## DECLARATION OF DAVID NORDGREN

Pursuant to 28 U.S.C. § 1746, I, David Nordgren, certify that the following declaration is based upon my personal knowledge

1.      My name is David Nordgren. At the time of Cheryl Rudolph's employment with Kelly Aerospace Power Systems, Inc., I was Director of Supply Chain Management for Kelly.

2.      Kelly Manufactures and distributes a varied line of component parts for piston and turbine aircraft. Kelly maintains a manufacturing and distribution facility in Fort Deposit, Alabama.

3.      I interviewed Ms. Rudolph for a position in the shipping department in November 2003. Ms. Rudolph was then hired to work for Kelly in the shipping department.

4.      Renee Branum was hired to work in the shipping department the day after Ms. Rudolph's hire.

5.      After working in the shipping department for approximately one month, on December 15, 2003, Ms. Rudolph and Ms. Branum were transferred to the stockroom, as noted on the Payroll Change Notices which recorded the transfers and are attached hereto as Exhibit 1.

The transfer of these employees was necessary because shipping is a critical department for Kelly. Kelly needed more experienced employees to work in the shipping department, as they could work more efficiently than Ms. Rudolph and Ms. Branum who were both fairly new employees.

6.      Steve Miller, the stockroom supervisor, was Ms. Rudolph's direct supervisor in the stockroom. I was Mr. Miller's supervisor.

7.      Ms. Rudolph's transfer from the shipping department to the stockroom did not require any real "training." The duties and responsibilities of the two departments are similar. As a stockroom clerk, Ms. Rudolph's duties included reviewing paperwork (an order), pulling the component parts required for the order from their location in the stockroom, and placing them on a cart for delivery in the Kelly facility. Any "training" for the position as a stockroom clerk derived through individual effort and familiarity. The stockroom duties simply required an employee to put forth effort and a willingness to learn and become familiar with the location of the parts in the stockroom and the terminology used.

8.      Sometime after Ms. Rudolph was transferred to the stockroom, her supervisor, Mr. Miller, informed me that she was not performing to the level required, that she was making mistakes, demonstrating no concern for those mistakes, and exhibiting a poor attitude. In January 2004, I began talking to Ms. Rudolph about her poor performance:

January 22:     I spoke with Ms. Rudolph about needing to improve her attitude, speed and accuracy.

January 23:     I spoke with Ms. Rudolph about the need to ask questions when she is unsure about what needs to be done.

January 27:     John Mincey, Kelly's Production Manager for Wastegates, Valves and Controls, spoke to Ms. Rudolph about the parts she was pulling for his department; specifically, he spoke to her about her failure to pull all of the proper parts and her damaging those parts that she did pull.

January 28,
29 & 30:      I talked to Ms. Rudolph about the fact that she sent a damaged part to the line and did not send all of the parts called for by the applicable work order. I also spoke with Steve Miller about Ms. Rudolph's bad attitude and her failure to follow orders.

January 30:      I talked to Ms. Rudolph about her poor performance, specifically, her inaccuracy, the fact that she was damaging parts, and that she was working too slowly. I also spoke with her about her bad attitude toward her supervisor, Mr. Miller.

The notes recording these discussions with Ms. Rudolph and placed in her personnel file are attached hereto as Exhibit 2.

9.      In addition, on January 30, 2004, I reviewed with Ms. Rudolph the Stockroom Flow Instructions she continued to disobey. My notation recording this is reflected on the Stockroom Flow Instructions for Production Work Orders placed in Ms. Rudolph's personnel file and attached hereto as Exhibit 3. This document also reflects John Mincey's conversation with Ms. Rudolph on January 27, 2004 regarding damaging and mishandling parts.

10.      On February 6, 2004 Jenny Neese, Human Resources Manager, and I met with Ms. Rudolph and informed her that she was being terminated from her job because of her poor work performance. Ms. Rudolph was terminated at the request of Kelly President, Jeffrey R. Kelly, who had learned of Ms. Rudolph's persistent poor performance.

11.      Although Ms. Branum initially exhibited a willingness to learn and a cooperative attitude, on February 5, 2004, I had to speak with Ms. Branum about her performance and review the Stockroom Flow Instructions she was failing to follow as recorded on the Stockroom Flow Instructions for Production Work Orders placed in her personnel file and attached hereto as Exhibit 4.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of February, 2006.

David Nordgren
_____
David Nordgren

4

# EXHIBIT 1

## Payroll Change Notice

☐ Enter on Pay Roll
☐ Change Rate
☑ Transfer From Dept. # _Shipping_ To Dept. # _Stockroom_
☐ Pay Off & Remove From Pay Roll

Name _Cheryl Rudolph_  SS # _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_
Department # _005100_    Employee # _2634_
Old Rate _____ Per _____ New Rate _____ Per _____  Date Effective _12-15-03_

**Remarks**   _Department change only_

☐ Discharged    ☐ Quit        ☐ Laid Off

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Ability | | | | |
| Conduct | | | | |
| Attendance | | | | |
| Production | | | | |

_David Nordgren_
Supervisor Signature

_Jenny L. Neese_
Human Resources Signature

_CBR_     _JNK_

_Jenny L. Neese_
Payroll Signature

**Payroll Change Notice**

☐ Enter on Pay Roll
☐ Change Rate
☑ Transfer From Dept. # _Shipping_ To Dept. # _Stockroom_
☐ Pay Off & Remove From Pay Roll

Name _Renee Branum_ SS # _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_
Department # _005100_  Employee # _1329_  Date Effective _12-15-03_
Old Rate _____ Per _____  New Rate _____ Per _____

**Remarks** _Department change only._

☐ Discharged   ☐ Quit      ☐ Laid Off

|              | Excellent | Good | Fair | Poor |
|--------------|-----------|------|------|------|
| Ability      |           |      |      |      |
| Conduct      |           |      |      |      |
| Attendance   |           |      |      |      |
| Production   |           |      |      |      |

_David Moodgran_
Supervisor Signature

_Jenny L. Neese_
Human Resources Signature

_Jenny L. Neese_
Payroll Signature

# EXHIBIT 2

1/22/04   Talked to her about her attitude, speed, accuracy. (They all need improvement)

1/23/04   Talked to her about asking questions, getting with John, April, Tara if needed. -(she has not)

1/29/04   John Mincey gave her instructions about pulling parts - (she is not pulling them all the time) damaged, wrong parts, short parts.

1/29/04
&
1/30/04   Part sent to the line damaged. WO sent to the line picked complete and parts were not all there.

1/28 1/29 1/30 - Talked to
Steve about her attitude
she is not following orders
& has a bad attitude.

1/30/04 - Told her she had
until 2/4/04 to
change her attitude w/
Steve, be more accurate,
speed up, avoid damaging
parts

# EXHIBIT 3

# Stockroom Flow Instructions for Production Work Orders

- Receive work order from production planner. (Determine if W.O. has been given a priority level)
- Pull all components on W.O. in the order that they are listed. (-9000 W.O. parts should be placed in red bins and –0000 parts in yellow)
  - If the parts bin is empty, check the bulk storage area listed on the bin. All component shortages should be listed on the front of the W.O. as they are encountered.
  - Be sure to separate components to avoid damage or misidentification.
- Evaluate part shortages and consult production planner to determine if new or alternate parts can be pulled. (Report any inventory discrepancies to your supervisor)
  - All remaining shortages should be clearly identified on the front of the W.O.
  - A shortage list should be maintained in the stockroom so that parts may be issued when received from quality inspection.
- Deliver W.O. to the production line.
  - Notify an assembly line member that a job has been delivered, and have them initial the W.O. (All shortages and levels of importance should be addressed at this time)

# Assy Line Flow Instructions for Production Work Orders

- Upon receipt, determine the level of importance and stage W.O. for production.
- Follow all applicable procedures, work instructions, and inspections during assembly.
  - The work instructions or an assembly check list is to be completed and included with the W.O.
- Deliver all completed units with the W.O. to the shipping department.
  - In the event that a W.O. can only be partially completed, stage the remaining components in the production area with a copy of the W.O. until the shortages are filled. The original W.O. will be returned from shipping.
- Notify the production planner that the W.O. is complete and in the shipping area.

# Shipping Flow Instructions for Production Work Orders

-

# EXHIBIT 4

# Stockroom Flow Instructions for Production Work Orders

- Receive work order from production planner. (Determine if W.O. has been given a priority level)
- Pull all components on W.O. in the order that they are listed. (-9000 W.O. parts should be placed in red bins and ~0000 parts in yellow)
    - If the parts bin is empty, check the bulk storage area listed on the bin. All component shortages should be listed on the front of the W.O. as they are encountered.
    - Be sure to separate components to avoid damage or misidentification.
- Evaluate part shortages and consult production planner to determine if new or alternate parts can be pulled. (Report any inventory discrepancies to your supervisor)
    - All remaining shortages should be clearly identified on the front of the W.O.
    - A shortage list should be maintained in the stockroom so that parts may be issued when received from quality inspection.
- Deliver W.O. to the production line.
    - Notify an assembly line member that a job has been delivered, and have them initial the W.O. (All shortages and levels of importance should be addressed at this time)

# Assy Line Flow Instructions for Production Work Orders

- Upon receipt, determine the level of importance and stage W.O. for production.
- Follow all applicable procedures, work instructions, and inspections during assembly.
    - The work instructions or an assembly check list is to be completed and included with the W.O.
- Deliver all completed units with the W.O. to the shipping department.
    - In the event that a W.O. can only be partially completed, stage the remaining components in the production area with a copy of the W.O. until the shortages are filled. The original W.O. will be returned from shipping.
- Notify the production planner that the W.O. is complete and in the shipping area.

# Shipping Flow Instructions for Production Work Orders

- 

Jenny,

Please file in Renee's Personnel file. I discussed these issues with her.

Thanks,

David 2/5/04

# EXHIBIT B

ORIGINAL

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5    CHERYL RUDOLPH,

6          Plaintiff,

7    Vs.                              CIVIL ACTION NO.
                                      2:05-cv-664-T
8    KELLY AEROSPACE POWER
     SYSTEMS, INC.,
9
          Defendant.
10

11

12            * * * * * * * * * * * *

13

14          DEPOSITION OF CHERYL RUDOLPH, taken

15   pursuant to stipulation and agreement before Lisa

16   J. Nix, Registered Professional Reporter and

17   Commissioner for the State of Alabama at Large, in

18   the Law Offices of Balch & Bingham, Suite 200, 105

19   Tallapoosa Street, Montgomery, Alabama on

20   Wednesday, January 25, 2006, commencing at

21   approximately 10:15 a.m.

22

23            * * * * * * * * * * * *

25

| | | |
|---|---|---|
| 1 | | signature.  Is that your signature? |
| 2 | A. | Yes, it is. |
| 3 | Q. | And the date to the left of that is what? |
| 4 | A. | The 7th, the 15th of '03. |
| 5 | Q. | Does that help you recall when you applied |
| 6 | | for a job with Kelly Aerospace?  Was it on |
| 7 | | July 15th, 1903 -- 2003? |
| 8 | | MR. RAUSS:  Off the record. |
| 9 | | (Off-the-record discussion.) |
| 10 | A. | I'm thinking maybe -- this is my |
| 11 | | application, but I'm thinking I put in one |
| 12 | | around the time -- maybe two applications |
| 13 | | at that place, at Kelly Aerospace, at |
| 14 | | that -- so I'm ... |
| 15 | | I'm not certainly sure is this the date |
| 16 | | when I -- maybe when I put the first |
| 17 | | application in there. |
| 18 | Q. | You did give Kelly Aerospace -- You did |
| 19 | | complete this form and give this to Kelly |
| 20 | | Aerospace; is that correct? |
| 21 | A. | Yes. |
| 22 | Q. | And that was around July 15th, 2003? |
| 23 | A. | Okay.  Yes. |

1      well, you just leave your application and

2      someone should get back with you.

3   Q.  Okay.  And the next thing you heard from

4      Kelly was sometime in November, you

5      received a call to come back out there; is

6      that right?

7   A.  Yes.

8   Q.  And did you do that?

9   A.  Yes.

10  Q.  Did you have an interview?

11  A.  Yes.

12  Q.  Do you remember with whom you interviewed?

13  A.  David.  I can't recall his last name right

14     off.  Norris?  I can't recall his last

15     name, but I know it was David.

16  Q.  Do you remember what his job was?

17  A.  He was something like a supervisor, lead

18     person or something maybe.

19  Q.  Did you talk to anybody else at Kelly at

20     that time, at that same day?

21  A.  Well, he took me for the -- when I finished

22     the interview, David proceeded to take me

23     through the warehouse, you know,

33

```
1         introducing me to different lead people

2         that was there.

3    Q.   Was his name David Nordgren?

4    A.   Yes.  I just can't pronounce it because I

5         have problems with my speech.

6    Q.   You're speaking just fine.  We can

7         understand you.

8              So David Nordgren, then, took you out

9         to the warehouse and showed you around a

10        little bit?

11   A.   Yes.

12   Q.   Had he told you that they were hiring you

13        at that point?

14   A.   At that particular point when I went

15        through the warehouse, he didn't say that I

16        was going to be hired right then.  But he

17        said that I was one of the candidates

18        that -- one of the people that he would be

19        considering in hiring, you know.

20   Q.   Okay.  Other than being introduced to

21        people, did you have any discussions with

22        anyone else at Kelly Aerospace on that day

23        when you came out and met with David?
```

35

1    A.    Not really, no.  He just briefly said --

2          well, we went through the warehouse.  This

3          is the shipping department, and they have

4          different series --

5              Because he was new himself, so a lot of

6          things he didn't know himself.

7    Q.    Did he ask you when you would be available

8          to start if they offered you the job?

9    A.    Yes.

10   Q.    What did you tell him?

11   A.    I can start right away.

12   Q.    Did you talk about compensation?

13   A.    No.

14   Q.    Did he tell you what the position would

15         pay?

16   A.    No.  I can't recall that.

17   Q.    Did you have a salary demand or a wage

18         demand?  Did you tell him you have to make

19         at least so many dollars per hour or

20         anything like that?

21   A.    No.

22   Q.    No discussion of compensation at all in

23         that meeting; is that correct?

36

1    A.    I can't recall.

2    Q.    How long did you meet with Mr. Nordgren?

3    A.    The time frame for the interview?

4    Q.    Yes.

5    A.    It was probably -- maybe was about from 30

6          to 45 minutes maybe.

7    Q.    At the end of the interview, how was it

8          left?  What did he say to you?  What did

9          you say to him?

10   A.    He told me to give him a couple of days,

11         that he should get back with me on when to

12         start after the interview.  So in a few

13         days, he did give me a call back.

14   Q.    And what did he say?

15   A.    When to start, and I told him I would be

16         there.  He told me to start on the --

17         November the 11th, that morning, to be

18         there at -- a little bit earlier than

19         usual, you know.

20             But he gave me the time and the

21         starting of the job, and I think it was

22         like 7 o'clock.  They had, like, two

23         varieties of times I'm thinking.  Some come

37

1       in at this time.  Some come in at another

2       time.

3            And he said, can you just be here?  And

4       I told him, yes, I would be there, so ...

5   Q.  And your first day at work at Kelly

6       Aerospace was November 11th, 2003; is that

7       right?

8   A.  Yes.

9                        (Defendant's Exhibit 2 was marked

10                           for identification.)

11  Q.  Ms. Rudolph, as part of the discovery in

12      this lawsuit, we have submitted some

13      requests for production of documents to

14      your lawyer.  And I'm handing you what's

15      been marked as Defendant's Exhibit 2 which

16      is --

17           Well, let me first ask, have you seen

18      that before?

19  A.  Yes.

20  Q.  Are these the answers to the request for

21      production of documents that your lawyer

22      has delivered to us?

23           Are those the answers that your lawyer

1    A.    Yes.

2    Q.    Were the other people you identified all

3          black?

4    A.    Yes.

5    Q.    Do you remember anybody else who worked in

6          the shipping department on the day you

7          started?

8    A.    No.

9    Q.    How long did you continue to work in that

10         same position in the shipping department?

11   A.    For about the -- for about a month.

12   Q.    And during that month, did any other people

13         get hired into the shipping department?

14   A.    Yes.

15   Q.    How many?

16   A.    One.

17   Q.    Do you remember who that was?

18   A.    Yes.   Renee Branum.

19   Q.    Renee Branum?

20   A.    Branum.

21   Q.    When was she hired?   Do you recall?

22   A.    A day after me.

23   Q.    While you were working in the shipping

1      department, what were your duties and

2      responsibilities?

3  A.  Was to pull parts, well, scan parts.

4      Prepare the parts to be picked up by Fed Ex

5      or Yellow, like that.  Had to pull the

6      parts, weigh the parts, scan the parts to

7      be shipped.

8  Q.  Okay.  How did you know what parts to pull?

9  A.  Kentrone had been there probably about four

10     months maybe.  He was kind of sort of

11     training me, showing me.

12  Q.  My question is, when you came to work in

13     the morning and you had to start to do your

14     job, you would have to pull some parts,

15     right?

16  A.  Yes.

17  Q.  How did you know where to -- you know, what

18     parts you were supposed to pull and what

19     you were supposed to do with them?

20  A.  It's like a slip or sheet or something.

21  Q.  Some paperwork?

22  A.  Paperwork that, you know, that they will

23     have in, like, a box or they'll bring it to

1       you or spit it out of the printer, whatever

2       they had, however they got the work

3       together, it would get to us.  And we had

4       to wait on the work sometime.  And it would

5       have this is what needs to go to this

6       place, so many, and --

7    Q.   Do you remember what they called that piece

8        of paper?

9    A.   No, I can't right off.

10   Q.   What would you have to do now that you have

11       this piece of paper in hand?  What did it

12       tell you to do?

13   A.   It will have the number and we need this

14       many parts.

15   Q.   A part number?

16   A.   Yes.

17   Q.   And how many parts?

18   A.   And how many -- the quantity that we need

19       to ship to this company.

20   Q.   Okay.

21   A.   Yes.

22   Q.   How did you go about pulling those parts?

23   A.   I had like a little table you'd just push

1    around, just walk around.  It was very

2    small, not very big.

3  Q.  Like a cart with wheels?

4  A.  Like a little cart, yeah.  You can go

5    around and pull them and put them on the

6    cart or either you can just do whatever

7    you've got to do right there when you're

8    pulling them.  I can't memorize every

9    little detail how it went, but the major

10    part, that was it.

11  Q.  Where were these parts that you were

12    pulling?

13  A.  Shipping department.  Like this -- It would

14    be like on a wall, like on little stands,

15    you know.  I need to explain that a little

16    bit better, but ...

17        It was like racks that the part would

18    be sitting on, maybe ten-feet racks that

19    they would be placed on different levels

20    and the numbers would be on them, yes.

21  Q.  So there were racks of parts in an area

22    next to your shipping area; is that right?

23  A.  Right behind me, yes.

```
 1                      MS. SPEARS-TURK:  Let him state

 2                  his question.  Then you

 3                  answer.  She can't take both

 4                  of you at the same time.

 5                  THE WITNESS:  Okay.  I'm sorry.

 6      Q.   So you would have an order form of some

 7           sort that you would then take, go to the

 8           next area where the parts are stored, find

 9           the part you needed, bring it back -- the

10           part that was called for by this order

11           page, whatever you called it --

12      A.   Yes.

13      Q.   -- collect all of the parts necessary to

14           fill that order; is that right?

15      A.   Yes.

16      Q.   And then what would you do with them?

17      A.   Bring them back to the front.

18      Q.   Front of the shipping department?

19      A.   Yeah, front of the shipping department.

20           And we would, like -- we put price tags and

21           things on them like that, weighing.  We had

22           to scan them.

23      Q.   Okay.
```

1   A.   We had to do that and then weigh whether it

2        was going to be first day, second day, to

3        do it like that, to pull the ticket to pack

4        it to be shipped.

5   Q.   Did you actually do the packing?

6   A.   Yes.

7   Q.   And when you finished packing the order,

8        what did you do with it?

9   A.   Load it up on a pallet.  After we finished

10       packing them, we would, like I say, put it

11       on a weigh-in.  If it was going to go UPS,

12       Fed Ex, whatever, we would have to do it

13       that way.  Whichever way we was going to

14       send the package, that's the way we had to

15       label it and then take it and put it on the

16       pallet for whatever.  If Fed Ex was going

17       to pick up this pallet, we had to put it

18       all on Fed Ex.  If Yellow was going to pick

19       it up or UPS, however it had to go, that's

20       how it was stocked.

21  Q.   And you did this job for about a month?

22  A.   Yes.

23  Q.   Was there anything else included in your

1          duties and responsibilities in the shipping

2          department job?

3     A.   That was my duty.

4     Q.   I didn't ask that question very well.  Let

5          me try again.  Did your duties include any

6          other tasks that you have not described

7          here today?

8     A.   Not to my knowledge, no.

9     Q.   And you worked in that job for about a

10         month; is that right?

11    A.   Yes.

12    Q.   When did you first find out how much money

13         you were going to be paid at Kelly

14         Aerospace?

15    A.   When did I first find out?

16    Q.   Yes.

17    A.   When I was hired, Jenny, she told me what I

18         would be making.  At first when I first

19         started, I didn't know.  I had to stop one

20         of the supervisors and ask them, can you

21         tell me what my rate of pay is?  And I

22         can't call that person's name right off,

23         but they was like, seven dollars.  I was

83

1    like, oh, okay.

2    Q.   You don't know who that person was?

3    A.   I can't recall that person, no.  They was

4         very unorganized with a lot of things.

5    Q.   You started to say that you had a

6         conversation with Jenny about it?

7    A.   Yeah, about my seven dollars.  I want to be

8         honest.  I'm thinking at the time when I

9         was going to have the conversation with

10        Jenny about my pay, I don't know was she

11        busy or what was going on, but I got

12        with -- I'm not sure was it David whom I

13        asked, because basically I would go to him

14        because he was over me about a lot of

15        things.  And I'm thinking -- I'm not sure,

16        but I'm thinking he maybe was the one that

17        told me that I was making seven dollars an

18        hour.

19   Q.   Was that during the first day you were

20        working that you had that conversation?

21   A.   First or the second day.  It wasn't right

22        off, no.  It wasn't right off.  Because I

23        was basically the first day focusing on

84

1    what I was -- had to do in my job.

2    Q.    During that first week, did you have any

3          conversation with Jenny about your pay?

4    A.    I can't recall.

5    Q.    Were you unhappy being paid seven dollars

6          an hour at the time?

7    A.    Well, no, because I thought it probably

8          would be okay.  You know, I thought it was

9          okay at first.  I thought that maybe what

10         the job was -- you know, was paying me for

11         what I was worth or whatever.

12   Q.    Were you aware that the normal starting

13         rate for that kind of work at Kelly

14         Aerospace was $6.50?

15   A.    No.

16   Q.    Did you ever learn that fact?

17   A.    No.

18   Q.    Do you recall the names of any other people

19         who did the same kind of work that you did

20         when you were in the shipping department?

21   A.    That maybe had did the work before I got

22         there?

23   Q.    No, that were doing it at the same time.

85

| | | |
|---|---|---|
| 1 | A. | The people I gave you. |
| 2 | Q. | Renee Branum, Kentrone Lane, Robert |
| 3 | | Peterson and yourself? |
| 4 | A. | Yes. |
| 5 | Q. | You worked in that job for about a month, |
| 6 | | you said; is that right? |
| 7 | A. | Yes. |
| 8 | Q. | Then what happened? |
| 9 | A. | They transferred me to the stockroom. |
| 10 | Q. | Who is they? |
| 11 | A. | David.  It was another lady that worked |
| 12 | | there.  I don't know her name.  Reed or |
| 13 | | something, last name.  She was over a lot |
| 14 | | things, too.  I can't recall her first |
| 15 | | name. |
| 16 | | But anyway -- |
| 17 | Q. | Is that someone -- |
| 18 | A. | I guess David and her had something to do |
| 19 | | with that, me moving. |
| 20 | Q. | Reed was someone else who worked in the |
| 21 | | shipping department? |
| 22 | A. | She was over that, over -- I'm thinking |
| 23 | | maybe over David or -- I don't know how |

1    supervisor or higher at Kelly about the

2    move from the shipping department to the

3    stockroom?

4    A.    No.

5    Q.    Okay.  What did David tell you about the

6    change in jobs?

7    A.    That they were going to move me to the

8    stockroom because they needed help back

9    there or something like that, needed help

10    in the back stocking parts.

11    Q.    Do you remember anything more specific than

12    that about what he said to you?

13    A.    No.  All he just said, that I was going to

14    be moved to the back, to the stockroom.

15    Q.    Did he even tell you why?

16    A.    Let me think.  Not to my knowledge, no.

17    Q.    Did anyone tell you why that switch was

18    being made?

19    A.    No.

20    Q.    What were your duties and responsibilities

21    in the stockroom?

22    A.    Was to pull parts, turbo parts, and get

23    those -- pull the turbo parts and get them

88

```
 1        prepared for shipment to the other areas in

 2        the warehouse.

 3    Q.  Is this the same stockroom that was next to

 4        the shipping department that you referred

 5        to before?

 6    A.  Yes, in the back, yes, sir.

 7    Q.  And when you say your job was to pull turbo

 8        parts and get them prepared for shipment to

 9        other areas --

10    A.  Yeah.

11    Q.  -- what do you mean?

12    A.  That will be -- The stockroom would be the

13        beginning, like where they, I guess, gather

14        the parts off the trucks or however they

15        did that.  All my job were is to pull them,

16        to pull them.

17    Q.  So we're talking about component parts that

18        were going to be used by Kelly to make

19        other parts; is that right?

20    A.  Yes.

21    Q.  So in the stockroom, your job -- did you

22        also get a form like an order form that

23        told you what to do?
```

89

```
1    A.    Yeah, they have that.

2    Q.    That's similar to what you had in the other

3          job in the shipping department?

4    A.    Maybe a little different.

5    Q.    In what way was it different?

6    A.    It tells you what you need to pull, how

7          many you need to pull.  It's probably

8          similar.  I can't exactly remember exactly

9          how that stock form were and how the

10         shipping were, but it was similar, I'm

11         sure.

12   Q.    And in the shipping department, the goods

13         you were pulling were finished goods that

14         were going to customers; is that right?

15   A.    Yes.

16   Q.    And in the stockroom, you were taking

17         components to send to other parts of the

18         Kelly operation so that they could be used

19         by Kelly people to make parts?

20   A.    Yes.

21   Q.    To make finished goods?

22   A.    Yes.

23   Q.    When you started in the stockroom, who else
```

98

```
 1                    don't know, you have to ask
 2                    about it?)
 3    A.    No, they ain't never told me that.
 4    Q.    Did Steve Miller or David Nordgren or any
 5          other supervisor at Kelly ever talk to you
 6          about your failing to follow instructions?
 7    A.    No.
 8    Q.    Did Steve Miller or David Nordgren or any
 9          other supervisor at Kelly ever talk to you
10          about your failing to follow orders?
11    A.    No.
12    Q.    Did Steve Miller or David Nordgren or any
13          other supervisor at Kelly ever have a
14          discussion with you about your attitude at
15          work?
16    A.    No.
17    Q.    Did Steve Miller or David Nordgren or any
18          other supervisor at Kelly ever talk to you
19          about the speed at which you were doing
20          your work?
21    A.    No, they did not.
22    Q.    Did Steve Miller or David Nordgren or any
23          other supervisor ever talk to you about the
```

99

```
 1          need to improve your job performance while

 2          you were working in the stockroom?

 3     A.   No.  No.  It was a guy that worked in

 4          the -- he was over turbo.  I don't know his

 5          name either.  They had some type of

 6          meeting, and he requested that I be in the

 7          meeting or something like that, but I can't

 8          recall his name.

 9     Q.   What was the point of the meeting?

10     A.   It was like we need to just have this

11          meeting to talk about the different parts

12          and how they need the parts to get to, you

13          know, certain areas and stuff like that.  I

14          can't call his name, but ...

15     Q.   Was Renee in that meeting, too?

16     A.   No.

17     Q.   Did she pull the same parts that you did?

18     A.   Yes, we did the same -- same job.

19     Q.   And what do you remember about that

20          meeting?

21     A.   It was like we got the -- I can't call his

22          name, like I said.  It was like -- the

23          meeting was like we -- I can't remember
```

100

1      exactly what went on in that meeting.  I

2      can't exactly say.  But it was pertaining

3      to the quality, I guess, and the parts and

4      how the parts was being shipped and all

5      that stuff like that.

6   Q.  Was anybody critical of your job

7      performance at that meeting?

8   A.  No.

9   Q.  Who was in attendance at that meeting

10      besides the person who called it whose name

11      you don't recall and you?

12   A.  I can't recall because it was other areas,

13      and I didn't know all the employees there.

14   Q.  Were there a lot of people there?

15   A.  No.

16   Q.  More than five?

17   A.  Maybe five.

18   Q.  After that meeting was over, did you think

19      about it and wonder why you were asked to

20      participate?

21   A.  No.

22   Q.  Did you understand why you were asked to

23      participate?

101

1    A.    Well, I was still new at the job, so I kind

2          of felt like it was just to make sure the

3          parts get shipped.  That's what I felt it

4          to be, what was being said.

5    Q.    But you weren't shipping in that job.  You

6          were in the stockroom.

7    A.    It was dealing with shipping and stocking,

8          all of them.  Like different departments

9          was in that meeting.

10   Q.    Did you learn anything in that meeting that

11         helped you in your job?

12   A.    Yeah.

13   Q.    What did you learn?

14   A.    How to better assist the customers out in,

15         you know, the different areas that the

16         parts are being sent to and to always carry

17         quality with what you do.  That's what I

18         basically learned.

19   Q.    Do you know the name John Mincy?

20   A.    I'm thinking that's ringing a bell, John

21         Mincy.

22   Q.    Do you know who he is?

23   A.    I don't know him personally, no.

102

1    Q.    Did you ever meet him when you were working

2          at Kelly?

3    A.    I'm thinking John Mincy was a little short

4          guy.  I'm not sure that's him, but that

5          name is ringing a bell on me.

6    Q.    Is he the person who called this meeting

7          you were talking about?

8    A.    Yes.

9    Q.    Was he at that meeting?

10   A.    Yes.

11                     (Defendant's Exhibit 4 was marked

12                        for identification.)

13   Q.    I'm handing you what's been marked for

14         identification as Defendant's Exhibit 4.

15         Can you identify that document?

16   A.    I never received one of these.

17   Q.    You've never seen it before?

18   A.    No.

19   Q.    Okay.  That's fine.

20         Do you remember the date that you last

21         worked at Kelly Aerospace?

22   A.    February 6, 2000 ... February 6, 2000 ...

23   Q.    Four?

103

1    A.    Four, yes.

2    Q.    How did you learn that your employment was

3          ending?

4    A.    How did I learn that my employment was

5          ending -- being terminated?

6    Q.    Yes, sir.

7    A.    David came to me and then he said that they

8          would like to talk to -- Jenny Neese would

9          like to talk to me in the office.  And

10         that's when we proceeded to the office, and

11         Jenny started telling me that we was going

12         to have to terminate you -- terminate you

13         due to lack of work performance or

14         something like that.

15   Q.    What did you say?

16   A.    I said, terminate me?  I said, but I've

17         been doing my job.  And she was like --

18         started coming up with different little

19         things.  You haven't been doing this, you

20         haven't been doing that.

21   Q.    Do you remember what those this's and that's

22         were?

23   A.    No.  That's basically -- you know, I told

108

1   Q.   Are you familiar with it?

2   A.   Yes.

3   Q.   Drawing your attention to the second page,

4        there's a heading, Factual Allegations, and

5        a number of numbered paragraphs under

6        that.

7             In paragraph seven, you've alleged

8        that, in essence, you learned that you had

9        been hired at a lower rate of pay than a

10       white co-worker or white counterpart with

11       whom you worked and you performed the same

12       job functions.  Do you see that allegation,

13       number seven?

14  A.   (Witness nods head up and down.)

15  Q.   Who is the white counterpart to whom you

16       are referring?

17  A.   Renee Branum.

18  Q.   At the end of that paragraph, you said:

19       Plaintiff complained to management.  Who in

20       management did you complain about -- Let me

21       strike the sentence.

22            Did you complain to management about

23       the fact that Renee Branum was being paid

| | | |
|---|---|---|
| 1 | | more than you? |
| 2 | A. | Yes. |
| 3 | Q. | To whom did you make that complaint? |
| 4 | A. | David. |
| 5 | Q. | David Nordgren? |
| 6 | A. | Yes. |
| 7 | Q. | When did you make that complaint? |
| 8 | A. | I can't remember the date. |
| 9 | Q. | Was it after you were moved into the |
| 10 | | stockroom? |
| 11 | A. | Yes. |
| 12 | Q. | Was it before the time you were fired? |
| 13 | A. | Yes. |
| 14 | Q. | What did you say to David? |
| 15 | A. | I want to know why Renee is making eight |
| 16 | | dollars and I'm making seven when she has |
| 17 | | no experience and I do. |
| 18 | Q. | What did he say? |
| 19 | A. | You have to talk that over with -- well, he |
| 20 | | was always hunching his shoulders.  He was |
| 21 | | like, you have to talk that over with |
| 22 | | personnel or whatever, something like that. |
| 23 | | I can't exactly remember what he said to me |

110

1          at that particular time.

2    Q.    Basically he said you have to talk to the

3          personnel department about it?

4    A.    Yeah.

5    Q.    Did you ever talk to anyone at the

6          personnel department about it?

7    A.    No.

8    Q.    Paragraph eight, you state:  Two months

9          into your employment with Kelly, the white

10         female was moved to the stockroom -- that's

11         Renee Branum -- and you learned through

12         another employee that Renee was being moved

13         because of mistakes she was making.  Do you

14         see that allegation?

15   A.    Uh-huh.  (Positive response.)  Yes.

16   Q.    Who told you that Renee was being moved

17         because of mistakes she was making?

18   A.    Robert Peterson and Kentrone Lane.

19   Q.    Robert Peterson and Kentrone Lane were

20         co-workers of yours in the shipping

21         department?

22   A.    Yes.  Robert was like a lead person.

23   Q.    But he was not a management person?

113

```
 1   A.   Yes.

 2   Q.   And who's the other company employee that

 3        you refer to in that sentence?

 4   A.   Talking about David and Steve.

 5   Q.   So you're saying that Renee was assisted in

 6        performing her daily duties by Steve and

 7        David?  Is that what you're claiming?

 8   A.   Yes.

 9   Q.   Did you ever see David pull a part?

10   A.   You asked me have I ever seen him pull a

11        part?

12   Q.   Yeah.

13   A.   I can't recall right off, but he stayed

14        back in the stockroom all the time.  So I

15        can't --

16   Q.   How do you know that David assisted Renee?

17   A.   Because like I say, they have, like, a -- I

18        ain't going to say he assisted her, but he

19        mostly just like looked out for her when it

20        came down to her job.  Then when it came

21        down to mine -- but Steve was the one that

22        basically assisted her, with helping

23        pulling her parts.
```

1    A.    Yes.

2    Q.    Are those correct?

3    A.    Yes.

4    Q.    When you moved into -- were moved into the

5         stockroom, how did you know what to do?

6    A.    They just pulled me back there and was

7         saying this is what you've got to do right

8         here.  Basically the same thing you did in

9         the shipping department:  Go around with

10        the number, and this is what you do.

11             And they just turned me aloose, and I

12        was like, I'm lost.  You know, but common

13        sense, I just started to do my job as what

14        they wanted.

15   Q.    What kind of training should you have

16        had -- would you have liked to have had

17        that you didn't get?

18   A.    First of all, dealing with the computer

19        with the parts, like looking up parts,

20        different that, that and this with that.

21   Q.    I'm sorry.  I didn't understand that.

22   A.    Looking up parts in the computer.

23   Q.    When did you have to look up parts?

117

1   A.   Whenever you had to get a part or whatever,

2        like that.  You had to look in the computer

3        to get it.  And I had no assistance with

4        that.

5   Q.   Looking in the computer to find where the

6        part is kept?

7   A.   Yes.

8   Q.   Is that what you mean?

9   A.   (Witness nods head up and down.)

10  Q.   Didn't you have to do that in the shipping

11       department, too?

12  A.   No.  Had paperwork, just like this, you

13       know.  You read it.

14  Q.   Okay.  What other training do you believe

15       you should have received that you did not

16       receive?

17  A.   What other training?

18  Q.   Yeah.

19  A.   I should have gotten -- as far as help from

20       my supervisor, Steve, as far as showing me

21       what I need to do in this new department

22       that's totally new.  He wouldn't do it.

23       All he would say is, it's your job.  You

125

```
 1          you about the -- like you come in and
 2          talking about the products in there, how
 3          they have to get out and different stuff
 4          like that, that's basically what John Mincy
 5          was in the office about.
 6   Q.     Two 45-minute sessions?
 7   A.     Yes, and that was different times.
 8   Q.     When were those meetings?
 9   A.     Basically that was on the missing parts,
10          and I can't recall when was those meetings.
11   Q.     I don't understand.  In the complaint, you
12          said that you didn't receive any training
13          or assistance.  Subsequently after you
14          complained, you did later receive
15          two 45-minute training sessions.  Now
16          you're saying those aren't training
17          sessions.  Is the complaint correct or is
18          what you're telling us today correct?
19   A.     What I'm telling you is correct.  This is
20          correct.  But what I'm saying is, it wasn't
21          training -- it was a training session, but
22          it wasn't a training session as far as how
23          to do your job.
```

126

1              This was a training session as to this

2         is how we're going to try and get better in

3         this area to get parts out and blah, blah,

4         blah.  That's the way that were with him.

5         He was basically talking to everyone that

6         was in the room on different levels.

7              So I didn't really get much out of what

8         he was really saying because I thought I

9         was doing my job.

10    Q.    You described that meeting before, the one

11         you just referred to with John.

12    A.    Uh-huh.  (Positive response.)

13    Q.    What about the second of these

14         two 45-minute training sessions you talk

15         about in your complaint?

16    A.    It was about the same thing.

17    Q.    How far apart were those two meetings?

18    A.    They wasn't very far apart at all.  They

19         was like maybe a week here and the next

20         week or so, around the same little thing,

21         talking about the same.

22    Q.    You go on to state that this was the extent

23         of training received by plaintiff while the

1       white female has been trained on a daily

2       basis and was being assisted with her

3       regular duties; is that right?

4    A. Yes.

5    Q. What training did Renee Branum have?

6    A. What training did she get?

7    Q. Yeah.

8    A. She got assistance with showing her what

9       she needed to do, how she needed to do it,

10      and with my other hand, I can help you get

11      it out faster.  She made mistakes.  They

12      would cover them up.  I would be right

13      there looking at it.  I would say this is

14      not fair, you know.  You help her.  You're

15      not helping me.

16          And me and my supervisor, Steve, really

17      got into argutations (phonetic) about, you

18      know, you helping her and you're not

19      helping me and that's not fair, but insist

20      on -- keeping me from losing my job or

21      whatever, I just left it alone.

22   Q. Is it your allegation in this lawsuit that

23      the company treated this white woman better

1       than you because she's white and you're

2       black and this is about race

3       discrimination?

4   A.  Yes.

5   Q.  So that if the company had treated Renee

6       Branum and you the same way, you wouldn't

7       have a complaint here.  Isn't that right?

8   A.  I wouldn't.

9                   MR. RAUSS:  Let's take a

10                      five-minute break.

11                  (Brief recess was taken.)

12                  MR. RAUSS:  Back on the record.

13  Q.  Ms. Rudolph, in your answers to

14      interrogatories, which are Exhibit 3, take

15      a look at interrogatory number nine and the

16      answer to it.  We asked you to identify any

17      prospective employer where you applied for

18      employment after Kelly Aerospace and

19      provide some additional information.

20          First you indicated that you worked at

21      Kelly Home Health and were hired in May of

22      2004 and worked until October of 2004,

23      correct?

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CHERYL RUDOLPH,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        Case No.
                                         )        2:05cv664-T
KELLY AEROSPACE POWER SYSTEMS, )
INC.,                                    )
                                         )
        Defendant.                       )

### DECLARATION OF JENNY L. NEESE

Pursuant to 28 U.S.C. § 1746, I, Jenny Neese, certify that the following declaration is based upon my personal knowledge

1.      My name is Jenny L. Neese.   I am Human Resources Manager for Kelly Aerospace Power Systems, Inc.

2.      Cheryl Rudolph applied for a position with Kelly on July 15, 2003.   Ms. Rudolph's application is attached hereto as Exhibit 1. Ms. Rudolph was hired to work for Kelly in the shipping department in November 2003. Her first day of work was November 11, 2003.

3.      Ms. Rudolph's pay rate was set at $7.00 per hour.  Typically, entry level jobs, such as Ms. Rudolph's position as a shipping clerk, pay at the rate of $6.50 per hour.  However, this rate is adjusted when necessary, for example, when an applicant has a high level of relevant skills, or relevant experience, or an increased pay rate is necessary to attract a desirable applicant to accept a position to work for Kelly.  Because Ms. Rudolph had some relevant experience, as she had worked in a clothing warehouse and had some familiarity with handling goods for

shipping, it was determined that her pay rate should be $7.00 per hour, rather than the typical $6.50 per hour. Ms. Rudolph's payroll notice is attached hereto as Exhibit 2.

4.      Renee Branum applied for a position with Kelly in September 2003. Ms. Branum's application is attached hereto as Exhibit 3. Ms. Branum was hired to work for Kelly and began work on November 12, 2003 in the shipping department.

5.      At the time she applied, Ms. Branum was the manager of a Subway restaurant and was responsible for operation of the entire store, managing the employees, and purchasing and controlling inventory levels. Ms. Branum was interested in a new position, one with health insurance and greater opportunities than she had at Subway. After Ms. Branum applied, a position in Kelly's shipping department opened. Kelly has difficulty finding qualified individuals to fill the shipping department positions and shipping is a critical need for Kelly. Because of Ms. Branum's experience and because she indicated that she would not change positions unless she could make approximately the same amount of money she was earning at Subway, $350 per week, Kelly offered her $8.00 ($320 per week) plus benefits for a position as a shipping clerk in an attempt to make the position attractive to Ms. Branum. She accepted the position in the shipping department at this pay rate. Ms. Branum's payroll notice is attached hereto as Exhibit 4.

6.      On February 6, 2004 David Nordgren, then Kelly's Director of Supply Chain Management, and I met with Ms. Rudolph and informed her that her employment was being terminated because of her poor work performance. Ms. Rudolph was terminated at the request of Kelly President, Jeffrey R. Kelly, who had learned of Ms. Rudolph's persistent poor performance. Ms. Rudolph's termination papers are attached hereto as Exhibit 5.

7.    On March 30, 2005, Ms. Branum's employment with Kelly was terminated because she violated company policy. Ms. Branum's termination paper is attached hereto as Exhibit 6.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _10th_ day of February, 2006.

Jenny L. Neese
Jenny Neese

# EXHIBIT 1

# KELLY AEROSPACE
## Application For Employment

All applicants will be considered for employment without regard to race, religion, color, sex, national origin, age, marital or any other status protected by law.  We are an Equal Opportunity Employer.

Position Applied For: __Open__                                          Date Of Application: 7-15-03

Referral Source: ____ Advertisement ____ Employee ____ Relative ____ Government Employment Agency
____ ✓ Walk-In ____ Private Employment Agency ____ Other _____

Name: Cheryl D. Rudolph                                          Telephone #: 563-7776

Address: 178 Pine Hill Ave Hayneville AL 36040

County: Hay Lowndes                          Social Security Number: 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

May we contact you at work? __✓__ Yes ____ No   If yes, please list work number: 548-6089

If you are under 18, can you furnish a work permit? ____ Yes ____ No

Have you ever been employed here before? ____ Yes __✓__ No

If yes: When: _____                          Position: _____

Are you legally eligible for employment in this country? __✓__ Yes ____ No
(Proof of U.S. Citizenship or immigration status will be required upon employment.)

Date available for work: any day                          Will you work overtime if required: __✓__ Yes ____ No

Type of employment desired: __✓__ Full-Time ____ Part-Time ____ Temporary
____ Seasonal ____ Educational Co-Op

Are you on lay-off and subject to recall: ____ Yes __✓__ No

Will you submit to a pre-employment drug test? __✓__ Yes ____ No

Have you ever been bonded? ____ Yes __✓__ No

Have you been convicted of a felony in the last seven (7) years? ____ Yes __✓__ No
(Such convictions may be relevant if job related, but does not bar you from employment.)

If yes, please explain: _____

## Education

| Name & Location Of School | Course Of Study | Yrs. Completed | Graduate? |
|---|---|---|---|
| High School: Central High | Basic | 12 | yes |
| Technical School: Trenholm State | Nursing | 1yr | No |
| College: | Major: | | |
| Other: | | | |

The Employer is an Equal Opportunity Employer.  The Employer does not discriminate in employment and no question on this application is used for the purpose of limiting or excluding any applicant's consideration for employment on a basis prohibited by local, state, or federal law.

## Prior Employment    (Start with most recent Employer)

| | |
|---|---|
| Employer: Liz Claiborne | Phone: 613-1100 / From: 5/95 To: 8-02 |
| Address: 151 Folmar Dr Hope Hull AL | Position: Booster Machine Oper, Stocker, QC |
| Duties: QCI, inspected garment for damage to be ship to othe department for the Stocked ship out. and Operator Booster Machine to tranport garment to shipping | Supervisors Name: Melinda young |
| | Starting Salary/Wages: 7.00 |
| | Final Salary/Wages: 8/0.87 |
| Reason For Leaving: Close Down (Lay off) | |

| | |
|---|---|
| Employer: American Apparel | Phone: 874-6442 / From: 7-92 To: 5/95 |
| Address: 1900 Selma Bypass Selma AL | Position: Sewing Machine Oper |
| Duties: Set pocket on Army Uniform Jackets. | Supervisors Name: Barbara Carol |
| | Starting Salary/Wages: $6.00 |
| | Final Salary/Wages: 7.60 prod. |
| Reason For Leaving: Like of work | |

| | |
|---|---|
| Employer: FS's Mobile Home part + Service | Phone: 548-6089 / From: 10-02 To: 7-03 |
| Address: 329 Tuskeena St. Hayneville AL | Position: Reception st |
| Duties: Place shipment + Recieve, Answering phone, Fax file, copy, count inventory, Take payment acc. | Supervisors Name: Earnest Randolph |
| | Starting Salary/Wages: 6.00 |
| | Final Salary/Wages: 6.00 |
| Reason For Leaving: Temp. | |

## Military Service

| Branch Of Service | From | To | Rank And Duties | Date Discharged |
|---|---|---|---|---|
| | | | | |
| | | | | |

## Personal References

| Name | Address | Yrs. Known | Telephone |
|---|---|---|---|
| Earnest Randolph | 329 Tuskeena St. | 2 | 548-6089 |
| Lakisha Rogers | 1951 Mitchell young Rd Mont. | 4 | D-88-9062 |
| Wilma Smith | 191 White Estate Hayneville | 7 | 873-2208 |

The above information is true and complete to the best of my knowledge. Should I be employed by the Company, any misrepresentation or false statement contained herein may be considered cause for possible dismissal. The Company has my permission to obtain all necessary information from the references I have listed, or any other sources, concerning my prior employment, personal history or credit standing and I release all parties from any possible damages resulting from disclosing such information with or without prior written notice to me. I reserve the right to know the name and addresses of any investigative agencies used in order that I may learn the information contained in any reports furnished to the Company.

I understand this application does not constitute an employment contract of any kind. Should I be employed by the Company, I may resign such employment at any time at my discretion with or without prior notice and the Company may terminate my employment at any time at their discretion with or without cause and with or without prior notice.

Date: 7-15-03        Signature Of Applicant: Cheryl Randolph

# Applicant Data Record

Applicants are considered for all positions, and employees are treated during employment without regard to race, color, religion, sex, national origin, age, marital or veteran status, medical condition or handicap, or any other legally protected status.

As employers/governmental contractors, we comply with government regulations, including affirmative action responsibilities where they apply.

Solely to help us comply with government record keeping, reporting and other legal requirements, we request that you please fill out the applicant data record. We appreciate your cooperation.

This data is for periodic government reporting and will be kept in a confidential file separate from the application for employment. Your cooperation is voluntary.

(Please Print)

Date: 7-15-03

Position(s) Applied For: Open

Referral Source: _____ Advertisement _____ Friend _____ Relative __✓__ Walk-In

_____ Employment Agency _____ Other _____

Name: Cheryl Rudolph                          Phone: 563-7776

Address: 178 Pine Hill Ave Hayneville AL 36040

## Voluntary Survey

Government agencies at times require periodic reports on the sex, ethnicity, handicapped, veteran, and other protected status of applicants. This data is for analysis and possible affirmative action only. Submission of information is voluntary.

Check One: _____ Male __✓__ Female

Check One Of The Following:
Race/Ethnic Group: _____ White __✓__ Black _____ Hispanic

_____ American Indian/Alaskan Native _____ Asian/Pacific Islander

Check If Any Of The Following Are Applicable:

_____ Vietnam Era Veteran _____ Disabled Veteran _____ Handicapped Individual

# EXHIBIT 2

## Payroll Change Notice

☑ Enter on Pay Roll
☐ Change Rate
☐ Transfer From Dept. # _____ To Dept. # _____
☐ Pay Off & Remove From Pay Roll

Emp# 7634

Name  Cheryl O. Rudolph SS # 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
Department # 005100   Employee # ~~13~~   Date Effective 11-17-2003
Old Rate _____ Per _____   New Rate 7.00 Per hr

**Remarks** new employee, Shipping

☐ Discharged   ☐ Quit        ☐ Laid Off

|            | Excellent | Good | Fair | Poor |
|------------|-----------|------|------|------|
| Ability    |           |      |      |      |
| Conduct    |           |      |      |      |
| Attendance |           |      |      |      |
| Production |           |      |      |      |

_David Morgan_
Supervisor Signature

_Jenny L. Neese_
Human Resources Signature

_Jenny L. Neese_
Payroll Signature

# EXHIBIT 3

# KELLY AEROSPACE
## Application For Employment

All applicants will be considered for employment without regard to race, religion, color, sex, national origin, age, marital or any other status protected by law.  We are an Equal Opportunity Employer.

Position Applied For: _Purchasing / Any_    Date Of Application: _9 / 25 / 03_

Referral Source: ____ Advertisement ✓ ____ Employee ____ Relative ____ Government Employment Agency
____ Walk-In ____ Private Employment Agency ____ Other _Lavon Clark_

Name: _Renee D. Branum_    Telephone #: _334-300-5459_

Address: _480 Steiner Store Road_

County: _Butler_    Social Security Number: _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_

May we contact you at work? __X__ Yes ____ No    If yes, please list work number: _334-227-0329_

If you are under 18, can you furnish a work permit? ____ Yes ____ No

Have you ever been employed here before? ____ Yes __X__ No

If yes: When: _____    Position: _____

Are you legally eligible for employment in this country? __X__ Yes ____ No
(Proof of U.S. Citizenship or immigration status will be required upon employment.)

Date available for work: _two weeks_    Will you work overtime if required: __X__ Yes ____ No

Type of employment desired:    __X__ Full-Time ____ Part-Time ____ Temporary
____ Seasonal ____ Educational Co-Op

Are you on lay-off and subject to recall: ____ Yes __X__ No

Will you submit to a pre-employment drug test? __X__ Yes ____ No

Have you ever been bonded? ____ Yes __X__ No

Have you been convicted of a felony in the last seven (7) years? ____ Yes __X__ No
(Such convictions may be relevant if job related, but does not bar you from employment.)

If yes, please explain: _____
_____
_____

## Education

| Name & Location Of School | Course Of Study | Yrs. Completed | Graduate? |
|---|---|---|---|
| High School: Greenville High  Greenville | General | 4 | 4 |
| Technical School: | | | |
| College: Auburn @ Montgomery | Major: Criminal Justice | 4 | No |
| Other: Lurleen B. Wallace  Greenville | General | 2 | No |

The Employer is an Equal Opportunity Employer.  The Employer does not discriminate in employment and no question on this application is used for the purpose of limiting or excluding any applicant's consideration for employment on a basis prohibited by local, state, or federal law.

# Prior Employment    (Start 'n most recent Employer)

| | |
|---|---|
| Employer: Subway | Phone: 334-227-0329 | From: 3/2003 | To: Current |
| Address: 925 Old Fort Road Fort Deposit, AL 36032 | Position: Manager |
| Duties: Responsible for operation of the store | Supervisors Name: Sonay Patiday |
| Hiring of employees and termination | Starting Salary/Wages: $ 8.50/hr |
| Purchasing of food and anything needed | Final Salary/Wages: $ 950.00 |
| for good operation of the store | |
| Reason For Leaving: Need insurance and a chance to accomplish more | |

| | |
|---|---|
| Employer: The Restaurant | Phone: — | From: 5/2002 | To: 11/2002 |
| Address: 912 old Fort Road Fort Deposit, AL 36032 | Position: Waitress/Cashier/Book |
| Duties: Helped with the planning of a family owned | Supervisors Name: Larry Rushing |
| and operated business. | Starting Salary/Wages: $ 6.00 |
| Recognized teamwork and family ties. | Final Salary/Wages: $ 6.75 |
| Reason For Leaving: Owner decided to close | |

| | |
|---|---|
| Employer: Tommy Grantham Construction | Phone: — | From: 1/2002 | To: 5/2002 |
| Address: Hwy 90 | Position: Part-time Secretary |
| Duties: Filing | Supervisors Name: Tommy Grantham |
| Answering multiple phone lines | Starting Salary/Wages: |
| Talking with potential contractors for | Final Salary/Wages: |
| building projects | |
| Reason For Leaving: Helping out a friend until full-time was found | |

## Military Service

| Branch Of Service | From | To | Rank And Duties | Date Discharged |
|---|---|---|---|---|
| | | | | |

## Personal References

| Name | Address | Yrs. Known | Telephone |
|---|---|---|---|
| Lavon Clark | 255 Cunningham Street | 10 yrs | 334-437-2448 |
| Larry Rushing | 1251 Tyson Road | 10 yrs | 334-799-0465 |
| Sunny Patidar | 925 old Fort Road | 7 mon | 334-430-4656 |

The above information is true and complete to the best of my knowledge. Should I be employed by the Company, any misrepresentation or false statement contained herein may be considered cause for possible dismissal. The Company has my permission to obtain all necessary information from the references I have listed, or any other sources, concerning my prior employment, personal history or credit standing and I release all parties from any possible damages resulting from disclosing such information with or without prior written notice to me. I reserve the right to know the name and addresses of any investigative agencies used in order that I may learn the information contained in any reports furnished to the Company.

I understand this application does not constitute an employment contract of any kind. Should I be employed by the Company, I may resign such employment at any time at my discretion with or without prior notice and the Company may terminate my employment at any time at their discretion with or without cause and with or without prior notice.

Date: 9/25/03    Signature Of Applicant: Renee Branum

**Applicant Data Record**

Applicants are considered for all positions, and employees are treated during employment without regard to race, color, religion, sex, national origin, age, marital or veteran status, medical condition or handicap, or any other legally protected status.

As employers/governmental contractors, we comply with government regulations, including affirmative action responsibilities where they apply.

Solely to help us comply with government record keeping, reporting and other legal requirements, we request that you please fill out the applicant data record. We appreciate your cooperation.

This data is for periodic government reporting and will be kept in a confidential file separate from the application for employment. Your cooperation is voluntary.

(Please Print)

Date: 9/25/03

Position(s) Applied For: Purchasing / Any

Referral Source: _____ Advertisement  X Friend  _____ Relative  _____ Walk-In

_____ Employment Agency  _____ Other _____

Name: Renee Branum                          Phone: 334-300-5459

Address: 480 Steiner Store Road Greenville, AL 36037

## Voluntary Survey

Government agencies at times require periodic reports on the sex, ethnicity, handicapped, veteran, and other protected status of applicants. This data is for analysis and possible affirmative action only. Submission of information is voluntary.

Check One: _____ Male  X Female

Check One Of The Following:
Race/Ethnic Group:  ✓ White  _____ Black  _____ Hispanic

_____ American Indian/Alaskan Native  _____ Asian/Pacific Islander

Check If Any Of The Following Are Applicable:

_____ Vietnam Era Veteran  _____ Disabled Veteran  _____ Handicapped Individual

# EXHIBIT 4

## Payroll Change Notice

☑ Enter on Pay Roll
☐ Change Rate
☐ Transfer From Dept. #_____ To Dept. #_____
☐ Pay Off & Remove From Pay Roll .

Name _Renee Branum_     SS # _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_
Department # _005100_   Employee # _1329_      Date Effective _11-12-03_
Old Rate _____ Per _____ New Rate _8.00_ Per _hr_

**Remarks** _new employee, Shipping_

☐ Discharged    ☐ Quit          ☐ Laid Off

|            | Excellent | Good | Fair | Poor |
|------------|-----------|------|------|------|
| Ability    |           |      |      |      |
| Conduct    |           |      |      |      |
| Attendance |           |      |      |      |
| Production |           |      |      |      |

_David Rodgers_
Supervisor Signature

_Jenny R. Reese_                          _Jenny R. Reese_
Human Resources Signature          Payroll Signature

# EXHIBIT 5



**EMP#:**            7634

**FIRST**  Cheryl              **LAST NAME** Rudolph

**SSN:**    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

**HIRE DATE:**        11/11/2003    **REHIRE DATE:**

**EMP STATUS**  T              **IF T, CODE**  T

**TERM REASON:**  Poor Performance

**TERM DATE**    02/06/2004

**OTHER COMMENTS**

Monday, February 09, 2004

DEPARTMENT OF INDUSTRIAL RELATIONS
UNEMPLOYMENT COMPENSATION AGENCY

## NOTICE OF CLAIM AND REQUEST FOR SEPARATION INFORMATION

**IMPORTANT NOTE:** If your response is not received by 02-19-04 a determination may be made based solely on information furnished by the claimant. Return one copy only to the address below.

92    186858    00

KELLY AEROSPACE POWER SYST INC
ELECTROSYSTEMS INC
PO BOX 273
FORT DEPOSIT AL 36032-0273

**MAIL TO:** MONTGOMERY UC CALL CENTER
P O BOX 211239
MONTGOMERY AL 36121-1239

FAX NUMBER 334-215-7557

The individual identified below has filed a claim for Unemployment Compensation benefits.

1. CLAIMANT'S NAME      : RUDOLPH/CHERYL
2. SOCIAL SECURITY NO. : 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
3. DATE OF CLAIM        : 02-08-04
4. DATE MAILED          : 02-10-04

5. BASE PERIOD BEGINS: 10-01-02
6. OFFICE-COUNTY    : 6001
7. MAIL CODE        : 9
8. TYPE CLAIM       : N-01

The claimant identified you as his/her last employer and alleges the reason for separation to be:

DISCHARGE FOR UNSATISFACTORY WORK

LDW 02-06-04

## EMPLOYER RESPONSE

9. Claimant's last day employed was __2-6-04__
   (If temporary layoff, enter expected date of recall: _____ .)

10. If the claimant was paid vacation and/or separation pay or will receive a pension upon termination, or earned wages with you on or after the date shown in item 3. above, complete the applicable space(s) below:
   a. GROSS WAGES    $_____ paid for period _____ to _____
   b. VACATION PAY    $_____ paid for period _____ to _____
   c. SEPARATION PAY $_____ paid for period _____ to _____
      (1) Was separation pay a legal obligation or a courtesy/gift? _____
      (2) If a legal obligation, what required that it be paid (contract, company policy, labor agreement, etc.)? _____
      (3) Does contract, policy, or agreement require that such payment be made with respect to a specific period following termination? _____ Explain: _____

      (4) Does contract, policy, or agreement provide for reduction of severance payments based on some act by the claimant after separation? _____ Explain: _____

   d. PENSION        $_____ per month. Effective Date _____

11. REASON FOR SEPARATION: (ATTACH ADDITIONAL SHEET IF NECESSARY)
Employee was not performing satisfactorily. Errors, productivity, etc.

| _Jerry L. Reese_ | _HR Man_ | _2-12-04_ | _334-227-0129_ |
|---|---|---|---|
| SIGNED | TITLE | DATE | TELEPHONE NO. |

INSTRUCTIONS ON REVERSE SIDE

# EXHIBIT 6



**EMP#:**                1329

**FIRST**  Renee                    **LAST NAME** Branum

**SSN:**    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

**HIRE DATE:**        11/12/2003      **REHIRE DATE:**

**EMP STATUS** T                **IF T, CODE** T

**TERM REASON:** Violation of company policy

**TERM DATE**      3/30/2005

**OTHER COMMENT**        Profane and abusive language to another
                         employee

Friday, April 01, 2005

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CHERYL RUDOLPH,                    )
                                   )
         Plaintiff,                )
                                   )
v.                                 )          Case No.
                                   )          2:05cv664-T
KELLY AEROSPACE POWER SYSTEMS, )
INC.,                              )
                                   )
         Defendant.                )

### DECLARATION OF STEVE MILLER

Pursuant to 28 U.S.C. § 1746, I, Steve Miller, certify that the following declaration is based upon my personal knowledge

1.    My name is Steve Miller.  I am the stockroom supervisor for Kelly Aerospace Power Systems, Inc.

2.    On December 15, 2003, Cheryl Rudolph and Renee Branum were transferred to the stockroom.  I was their direct supervisor.  I gave both Ms. Rudolph and Ms. Branum some introductory information, but there is no real "training" for the position of stockroom clerk.  It is a position, which requires effort to become familiar with the parts and terminology, and the location of the parts in the stockroom.  A copy of the job description is attached hereto as Exhibit 1.  I worked with both Ms. Rudolph and Ms. Branum when they needed help.

3.    Both Ms. Rudolph and Ms. Branum initially made mistakes.  Unlike Ms. Rudolph, Ms. Branum was willing to learn from her mistakes and had a cooperative attitude.  Ms. Rudolph's performance was poor, she worked slowly, mishandled and damaged parts, and

when she made mistakes she did not seem concerned. In addition, Ms. Rudolph had a bad attitude towards me.

4.    I reported Ms. Rudolph's continued poor performance and bad attitude to my supervisor, David Nordgren who was then Director of Supply Chain Management for Kelly.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _10_ day of February, 2006.

_Steven Miller_
Steve Miller

# EXHIBIT 1



## INTERNAL JOB POSTING

| | | | |
|---|---|---|---|
| **POSITION AVAILABLE:** | Stockroom Clerk | **HOURS:** | 7:00a.m. – 3:30p.m. Monday - Friday |
| **DIVISION:** | Fort Deposit | **STATUS:** | Hourly |
| **DEPARTMENT:** | Materials | **SALARY:** | 6.50hr-9.00hr |
| **DATE OF POSTING:** | | **MANAGER:** | Sandra Passmore Steve Miller |

**SUMMARY:** Stocks, receives, and issues cores, material, or supplies by performing the following duties.

**ESSENTIAL DUTIES AND RESPONSIBILITIES** include the following. Other duties may be assigned.

Receives parts, cores, and supplies by count and vendor/customer.

Counts material, cores, and supplies in stock as required.

Must be experienced in the safe operation of forklift trucks and other types of material handling equipment.

Performs computer transactions to receive and issue material and cores in coordination with physical receipt or movements of inventory.

Supports production lines assigned through providing materials and cores at the required levels daily.

**QUALIFICATION REQUIREMENTS:** To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**EDUCATION and/or EXPERIENCE:** High school diploma and/or six months to one year related experience and/or training; or equivalent combination of education and experience. Forklift operation required.

**LANGUAGE SKILLS:** Ability to read and interpret documents such as safety rules, operating and maintenance instructions, and procedure manuals. Ability to write routine reports and correspondence. Ability to speak effectively before groups of customers or employees of organization.

**MATHEMATICAL SKILLS:** Ability to add, subtract, multiply, and divide in all units of measure, using whole numbers, common fractions, and decimals. Ability to compute rate, ratio, and percent and to draw and interpret bar graphs.

**REASONING ABILITY:** Ability to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Ability to interpret a variety of instructions furnished in written, oral, diagram, or schedule form.

**PRE-EMPLOYMENT TESTING:** Successful completion of pre-employment testing on mathematics, language, and reasoning ability.

**PHYSICAL DEMANDS:** While performing the duties of this job, the employee is regularly required to stand; reach with hands and arms. The employee must regularly lift and/or move up to 25 pounds and occasionally lift and/or move up to 50 pounds.

IF YOU ARE INTERESTED IN APPLYING FOR THIS POSITION PLEASE SEE JENNY NEESE

**DEADLINE FOR CONSIDERATION:**

EOE                                                                          M/F/D/V

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CHERYL RUDOLPH,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )          Case No.
                                         )          2:05cv664-T
KELLY AEROSPACE POWER SYSTEMS, )
INC.,                                    )
                                         )
        Defendant.                       )

## DECLARATION OF JEFFREY R. KELLY

Pursuant to 28 U.S.C. § 1746, I, Jeffrey R. Kelly, certify that the following declaration is based upon my personal knowledge

1.      My name is Jeffrey R. Kelly.  I am President of Kelly Aerospace Power Systems, Inc.

2.      On February 4, 2004, I learned of Cheryl Rudolph's continued poor job performance.  At that time, Ms. Rudolph was approaching the end of her ninety day probationary period.  Attached hereto as Exhibit 1 is an excerpt from Kelly's company handbook containing a description of Kelly's probationary period.  Because Ms. Rudolph was nearing the end of the probationary period and her job performance level was well below that required, I concluded it was appropriate to terminate Ms. Rudolph's employment.

3.      On February 6, 2004, David Nordgren, then Director of Supply Chain Management, and Jenny Neese, Human Resources Manager, had a meeting with Rudolph and terminated Ms. Rudolph's employment because of her poor performance.

165036.1

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

_____ day of February, 2006.


Jeffrey R. Kelly

# EXHIBIT 1

### Probationary Periods

The first ninety calendar days of employment constitute a probationary
period for all new employees.  For an employee who changes positions
within Kelly Aerospace Power Systems the first ninety days in a new
position also constitute a probationary period.   During this time, your
immediate supervisor and/or other members of management will evaluate
your overall skill sets, performance, teamwork, and attendance.  Every
effort will be made to properly train and assist you in becoming a
contributor to our team.  You will receive feedback at 30, 60, and 90 days
as to how you are meeting our expectations.  You should utilize this
feedback to take any corrective actions necessary to meet or exceed
company expectations.  Failure to meet the company's expectations
within the 90 day probationary period will result in termination of
employment.

Revise Date 7/1/2003